### RIO BRAVO OIL CO. v. McENTIRE et al. *
### No. 7736.

Court of Civil Appeals of Texas. Austin.
March 29, 1933.

Rehearing Denied May 3, 1933.

---

*Writ of error granted.

W. A. Wright, Chas. G. Russell, and C. H. Tupper, Jr., all of San Angelo, and Baker, Botts, Andrews & Wharton, of Houston, for appellant.

Kerr & Gayer and Smith & Neill, all of San Angelo, and P. O. Settle and Wm. L. Wise, both of Fort Worth, for appellees.

BLAIR, Justice.

Appellee George McEntire sued appellant, Rio Bravo Oil Company, in trespass to try title to recover sections 13, 23, and 25 in block 23, Houston & Texas Central Railway Company lands in Sterling county (formerly a part of Tom Green county). Appellant filed a general denial and general demurrer, and a plea of not guilty; but on the trial claimed only the minerals in the land with certain surface rights for the development and production of minerals. The Gulf Production Company intervened, claiming the oil and gas in sections 13 and 23, under a lease executed by appellee McEntire, which lease McEntire admitted to be valid. A trial to the court without a jury resulted in a judgment for appellee as prayed, and a judgment for the Gulf Production Company establishing the validity of its oil and gas lease; hence this appeal.

Appellant attacks the judgment in favor of appellee McEntire as not being supported by the evidence adduced; and the appeal therefore involves an analysis of the evidence and the construction of certain instruments in the light of the facts and circumstances surrounding their execution, as links in the chain of McEntire's title. We have reached the conclusion that the evidence sufficiently supports the judgments rendered.

The Houston & Texas Central Railway Company, hereinafter designated railway company, is the admitted common source of title, the 3 sections of land having been duly patented to it by the state of Texas in 1877, by virtue of surveys made under land scrip issued to it in 1867. In 1872 the railway company mortgaged these lands to the Farmers' Loan & Trust Company, trustee, the mortgage providing that said trustee shall sell the lands "at public or private sale," in default of the payment of the indebtedness secured; and that said trustee "shall execute a deed in fee simple" to purchaser, which "shall be a bar against * * * all claims * * * and all right of redemption" of the mortgagor and its successors and assigns; and that the deed "shall convey full and absolute title therein to the purchaser free and clear of all encumbrance." Thereafter, on June 24, 1882, the railway company contracted to sell section 23 to Jos. M. Kelley; and on August 12, 1882, it contracted to sell Kelley sections 13 and 25, the contracts reciting that the consideration was paid partly in cash and partly by notes secured by a lien upon the lands; and both of the contracts contained the following stipulations and reservations:

"In case the party of the second part, his legal representatives or assigns shall pay the said notes according to their tenor and effect, then the said railway company will make or cause to be made and executed unto the said party of the second part, his heirs or assigns (upon request at the general office of the party of the first part and the surrender of this contract) a deed conveying said premises with special warranty, but made subject to the following rights of the said railway company, each and all of which rights are hereby reserved and are not to pass by the deed to be made by said railway company. * * *

"The Houston and Texas Central Railway Company reserves the right at all times hereafter to enter upon the land hereby conveyed and prospect for and make surveys at will, and any part of it, for coal, mineral, stone, or any other valuable deposits, and to open upon said land and operate with all machinery, appliances and attachments which it may deem necessary, mines, borings and quarries, and the coal, mineral, stone, or other valuable deposits found in and taken from all such mines, borings and quarries shall be the property of said Houston and Texas Central Railway Company, and it shall have the right to remove the same, and for the purpose of ingress and egress to and from such mines, borings and quarries a further right of way over the land hereby conveyed sixty feet in width to and from such mines, borings and quarries is hereby reserved. * * *

"The said Joseph M. Kelley, by accepting this deed, agrees to the reservation aforesaid and to the entire contract hereinbefore specified, and covenants to and with the said railway company and its assigns that it and they shall have and enjoy all the reservations, rights and privileges contained and contracted for in this deed, and further agrees that this covenant shall run with the land hereby sold, and it is stipulated in this agreement that no assignment of the premises shall be valid unless the same shall be endorsed hereon."

It may here be noted that appellee contended, and the trial court found, that these contracts of sale did not include in the reservations petroleum or natural gas.

The June 24, 1882, contract was filed for record December 17, 1886; but the August, 1882, contract was not filed for record until October 4, 1929. On the June, 1882, contract there was indorsed: "Duplicate No. 12,781, Contract No. 31½C. Houston & Texas Central Ry. Co. With Joseph M. Kelley. For Sale of whole Sec. 23, Block 23, Tom Green County, 640 acres."

The notes referred to in the June, 1882, contract each recited:

"This note is given in part payment for 640 acres of land, being the whole of Section No. 23, Block No. 23, in the County of Tom Green, sold and conveyed to me by the said Houston & Texas Central Railway Company, by Contract No. 31½C, bearing date the 24th day of June, 1882, and is secured by a vendor's lien on said property as retained in said contract. No. L106, Due June 24, 1883."

Note No. 1 of this series of notes was paid June 25, 1883. The August, 1882, contract bears the following indorsement: "No. 12,-781, Contract No. 58C, Houston & Texas Central Ry. Co. With Joseph M. Kelley. For sale of Whole Sect. 13 and 25, Block 23, Tom Green County, 1280 Acres."

The notes referred to in the August, 1882, contract each recite: "This note is given in part payment for 1280 acres of land, being the whole of Section Nos. 13 and 25, Block No. 23, in the County of Tom Green, sold and conveyed to me by said Houston & Texas Central Railway Company, by contract No. 58C, bearing date the 12 day of August, 1882, and is secured by a Vendor's Lien on said property, as retained in said contract. No. L203, due Aug. 12, 1883."

The first of these notes was paid on August 16, 1883.

In 1885 several suits were filed in the federal court, seeking to foreclose mortgages executed by the railway company, one of which was filed by the Farmers' Loan & Trust Company, trustee; and these suits were all con-

solidated by order of the court and a receiver appointed.

On May 7, 1885, the court ordered the Farmers' Loan & Trust Company, trustee, to sell the lands in controversy, and to report to the receiver of the railway company all such sales. The said trustee was further ordered to execute deeds for lands theretofore sold by the railway company in all instances where the purchase-money notes had been paid; and that, in instances where contracts of sale had been made by the railway company and approved by the trustee, he should execute deeds to the respective purchasers; and that such deeds were to be held in escrow by the receiver for delivery to the purchasers whenever they had paid for the lands in full. On August 20, 1885, in pursuance of this order, the Farmers' Loan & Trust Company, trustee, acting under the deed of trust of October 1, 1872, executed to J. M. Kelley two instruments, each of which read in part as follows: "Now, Therefore, This Indenture Witnesseth, that the party hereto of the first part, in consideration of the premises and of the payment made to it by the said Receivers in pursuance of the above order, and of the sum of one dollar to it in hand paid by the party hereto of the second part, the receipt whereof is hereby acknowledged, hath granted, demised, released and quitclaimed, and, by these presents, doth grant, demise, release and quitclaim unto the party of the second part, and to his heirs and assigns forever, all that certain lot, piece or parcel of land and property situate, lying and being in the County of Tom Green in the State of Texas, known and described as follows, namely."

The instrument relating to the June, 1882, contract described the land conveyed as follows: "All of Section 23, Block 23, Certificate 1012, containing 640 acres, deeded to party of second part by the Houston and Texas Central Railway Company on the 24th day of June, 1882, by deed No. 31½C, at the price of Two dollars and fifty cents per acre, together with all and singular the rights, members, hereditaments and appurtenances to the same belonging or in anywise incident or appertaining."

The instrument relating to the August, 1882, contract described the land conveyed as follows: "All of Sections 13 and 25, Block 23, Certificates 1007 and 1013 containing 1280 acres, deeded to party of the second part by the Houston and Texas Central Railway Company on the 12th day of August, 1882, by deed No. 58C at the price of two dollars and twenty-five cents per acre, together with all and singular the rights, members, hereditaments, and appurtenances to the same belonging or in anywise incident or appertaining."

These two instruments were placed in escrow with the receiver of the railway company. The evidence is undisputed that the

railway company had defaulted in the payment of the 1872 mortgage to the Farmers' Loan & Trust Company, trustee.

It may here be noted that appellee contended that the above-quoted trustee's quitclaim deeds conveyed to Kelley "all that certain * * * land" described without any reservation of the minerals; and appellee further contended, and the evidence sustains the contention, that he was and is owner of the title to the surface of the lands in suit by virtue of recorded mesne conveyances as follows: Deed, J. M. Kelley to William Henry, 1883; deed, William Henry to J. A. Peacock & Bro., 1884; deed of trust, Peacock Bros. to E. C. Kellog, 1887; appointment of trustee, E. C. Kellog to A. W. Hudson, 1887; trustee's deed, A. W. Hudson to E. C. Kellog, 1887; quitclaim deed, E. C. Kellog to McEntire & Barnett, 1887; deed, McEntire & Barnett to W. H. Thomas, 1889; deed, W. H. Thomas to Wilson Live Stock Company, 1890; quitclaim deed, Wilson Live Stock Company to W. R. McEntire, 1898; deed, W. R. McEntire to George H. McEntire (undivided one-half interest), 1918; will, W. R. McEntire to Missie C. McEntire, 1920; deed, Missie C. McEntire to George H. McEntire, 1920.

Appellant contended that, when the aforementioned trustee's releases or quitclaim deeds are construed in the light of the court's order authorizing their execution, the placing of them in escrow with the receiver until the payment of the Kelley notes, and other proceedings concerning the Kelley notes, such instruments amounted to nothing more than a release of the Kelley notes. Appellant also contended that the Kelley contracts reserving the minerals in grantor severed dominion over them from that over the surface soil; and that, while it was true the mortgage covered the minerals, the trustee's release or quitclaim deeds referred to the Kelley 1882 contracts from the railway company, for description of the land intended to be conveyed; and that appellee was therefore bound and tied to the contracts reserving the title to the minerals, unless perchance something has intervened to destroy these reservations of minerals. In this connection appellee offered proof of a lost deed or deeds from the railway company conveying the lands to Kelley, and contended that the references in the trustee's quitclaim deeds were to the lost deed or deeds from the railway company to Kelley, instead of the Kelley 1882 contracts to purchase the lands from the railway company. And, as to the lands conveyed by the lost deeds, the evidence sustains the finding of the trial court that they conveyed "all of sections 13 and 25, in Block 23," and "all of section 23, in Block 23," without any reservation of the minerals. Other transactions concerning the Kelley notes and the claims of equitable title of appellee are as follows:

On May 4, 1888, Charles Dillingham was appointed special master commissioner in the aforementioned consolidated suit, to make sale of all the property of the railway company covered by what were known as the consolidated main line and western division mortgage, executed in 1872, and the main line and western division first mortgage, executed in 1873; and the evidence is undisputed that the lands in controversy, including the minerals, were covered by the first mentioned mortgage. In pursuance of this order, on September 8, 1888, the property covered by the two mortgages was sold by Charles Dillingham as special master commissioner to Frederick P. Olcott, without particular description of the property, but with the following exceptions: "Saving and excepting such portions of said land which have already been sold and including all notes given to secure the credit portion of the price of land sales." On December 4, 1888, the court approved the report of sale, and ordered deeds of conveyance to be made to Olcott; and on January 18, 1889, Charles Dillingham, as special master commissioner, the Farmers' Loan & Trust Company, trustee, and the other mortgage holders, executed a deed to Frederick P. Olcott, in accordance with the report of sale conveying the lands covered by the two mortgages, "saving and excepting such portions of said land as may have been heretofore and prior to May 4, 1888, sold to other purchasers, and including all notes given to secure the credit portion of the price of land sales." The lands were conveyed to Olcott without particular description, and the deed to Olcott was recorded August 24, 1905. Although this deed was executed in 1889, it was not delivered to Olcott for a long period of time, because, as shown by the evidence, the delivery of the possession was delayed by order of the court for reasons not material here. After Olcott purchased the property in 1888, the court ordered upon the application of Olcott that Charles Dillingham, receiver, continue to sell any of the lands and to execute deeds therefor upon the approval of Olcott and the mortgage holders. On February 1, 1891, by an unrecorded contract with Charles Dillingham, receiver, the Wilson Live Stock Company agreed to purchase the Kelley notes, together with all of the receiver's interest in the land in controversy, without reservation of title of any kind in said 1891 contract. This contract recited that the lands in controversy had been sold on June 24, 1882, and August 12, 1882, by written contracts to J. M. Kelley by the railway company; and that said contracts were "recorded in ―――― records of Tom Green County." This reference to the records was incorrect, because only the June 24, 1882, contract was recorded at that time. The 1891 contract further recited that there was a balance then due on the Kelley notes of $4,304.15, and provided that one-fifth of that amount should be paid in cash, and the balance to be evidenced by four notes of the same date, pay-

966

able to the said receiver, 1, 2, 3, and 4 years after date. The contract further provided that, if these notes were paid, then the receiver was obligated to transfer and assign the Kelley notes without recourse; and further as follows: "It is further understood that the party of the first part, his successors or assigns are to deliver said notes (Kelley notes) to the party of the second part, its successors or assigns, when the consideration hereinabove mentioned has been paid in full. When the Wilson Live Stock Co. shall have paid off in full the notes herein described, then the party of the first part, his successors or assigns shall assign and transfer to the party·of the second part, its successors or assigns all of his interest in said lands."

The record shows that Olcott, who purchased the entire railroad properties from the receiver, acquiesced in and received payment from the Wilson Live Stock Company under the 1891 contract. The Wilson Live Stock Company fully performed the 1891 contract by paying all the notes it has executed; which together with all of the Kelley notes were delivered to the Wilson Live Stock Company in 1898.

On February 17, 1891, Dillingham, receiver, reported that Olcott had assigned the property sold to him to the newly organized Houston & Texas Central Railroad Company, a corporation; and the orders of the court show delay in the delivery of these properties to the newly organized railroad company upon grounds not material here. By correspondence between appellee McEntire's father and the officials of the new Houston & Texas Central Railroad Company in 1898, the parties conceded that the aforementioned transactions fully released all notes executed by Kelley to the old Houston & Texas Central Railway Company, and all notes executed by the Wilson Live Stock Company to Charles Dillingham, receiver; and that the new Houston & Texas Central Railroad Company had no further claim in so far as the aforementioned notes were concerned. No deed or conveyance was executed by the receiver conveying the lands as he agreed to do under this contract.

It was contended by appellee that this 1891 contract superseded the 1882 Kelley contracts, and that appellee, having fully performed the 1891 contract, was entitled to a superior equitable title to the lands, including the minerals. Appellant contends that the 1891 contract amounted to nothing more than a renewal and extension of the Kelley notes; and that the performance of the contract and delivery of the notes constituted a release of them. By trial amendment appellant further contended that it was an innocent purchaser for value of the legal title to the minerals without notice of the 1891 Wilson Live Stock Company contract. And appellant claimed title to the minerals from the railway company through such of the above mesne conveyances as are applicable and as follows:

On August 21, 1918, the Houston & Texas Central Railroad Company, with the approval of the trustee of the Southern Pacific Company and of Dudley Olcott II, and James N. Wallace, who had acquired an interest from Frederick P. Olcott, purchaser of the old Houston & Texas Central Railway Company property, executed an instrument, deeding the minerals in the land in controversy, together with the minerals in some 80 or 90 other sections of land, to appellant Rio Bravo Oil Company. This deed was lost, and another executed in lieu of it, which was not recorded until 1929. The consideration recited for this conveyance of the minerals in the 80 or 90 sections of land was "the sum of Three Thousand Six Hundred and Seventy-seven and 00/100 ($3,677.00) Dollars in cash." The trial court found that the evidence was insufficient to show that this consideration was actually paid as applied to the issue of innocent purchaser for value.

From the facts adduced, the trial court concluded:

(1) That, if the 1882 Kelley contracts were valid, the reservation of minerals therein did not include petroleum or natural gas; (2) that the 1882 Kelley contracts were never carried out, but were superseded by the 1891 Wilson Live Stock Company contract, which was fully performed; (3) that the appellant Rio Bravo Oil Company was not an innocent purchaser for value of any legal title of the minerals without notice of the 1891 Wilson Live Stock Company contract; (4) that appellees McEntire and the Gulf Production Company hold the superior record title through the Farmers' Loan & Trust Company's deeds to all the lands in controversy; (5) that the Rio Bravo Oil Company failed to show any outstanding title to the minerals involved.

We do not sustain the conclusion of the trial court that the 1882 Kelley contracts did not reserve or include in the reservations the petroleum or natural gas. The language, "all coal, mineral, stone or any other valuable deposits," has a fixed and definite legal meaning, and under the well-settled rule in this state includes now and at the time the language was used the oil and gas in the lands, as a matter of law. States Oil Corporation v. Ward (Tex. Com. App.) 236 S. W. 446; Warner v. Patton (Tex. Civ. App.) 19 S.W.(2d) 1111; Graham's Estate v. Stewart (Tex. Civ. App.) 15 S.W.(2d) 72; Luse v. Boatman (Tex. Civ. App.) 217 S. W. 1096; Elliott v. Nelson, 113 Tex. 62, 251 S. W. 501; Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S. W. 296, 29 A. L. R. 607.

The evidence sustains the findings and conclusions of the trial court that appellee McEntire acquired the legal title to the

minerals as well as to the surface soil through the deeds from the trustee of the Farmers' Loan & Trust Company to Kelley, and the lost deed or deeds from the railway company to Kelley, referred to in the trustee's deeds as conveying "all of Section 23, Block 23," and "all of Sections 13 and 25, Block 23 * * * deeded" by said railway company to Kelley; and that appellee McEntire acquired the equitable title to the lands, including the minerals through his predecessors in title of the 1891 Wilson Live Stock Company contract. It is manifest that the trustee's deeds amounted to more than a mere release of the Kelley notes, when they are construed in the light of the facts and circumstances surrounding their execution. They were executed under order of the court with instruction to the railway company to list all "sales and contracts of sales" it had made of lands, together with all notes taken in part payment therefor. The list of sales filed by the railway company pursuant to this order showed that the lands in suit had been sold by the railway company to Kelley by "deed No. 31½ C," dated June 24, 1882, for $320 cash and four notes for $320 each; and "deed No. 58-C," dated August 12, 1882, for $576 cash, and four notes for $576 each. The court approved these sales and ordered the trustee to execute "deeds," not releases or quitclaim deeds, and to place them in the hands of the receiver in escrow, to be delivered to Kelley when the purchase-money notes were paid. The trustee then executed the deeds above quoted, which use the terms "granted" and "grant" in the conveyance clauses, and which under the provisions of article 1291, R. S. 1925, and our court decisions, are capable of conveying the largest possible estate in the lands. Neither the report of the railway company of sales nor the trustee's deeds made any reservation of the minerals from the conveyances. The trial court found that the trustee's deeds referred to the lost deed or deeds from the railway company to Kelley; and under the facts above detailed we are not prepared or authorized to say that no such deeds existed, and that as a matter of law the references in the railway company's lists and trustee's deeds were to the Kelley 1882 contracts of the same date, which required the execution of deeds when the notes were paid and the contracts were surrendered. The contracts with Kelley and introduced in evidence were introduced by appellant, and were shown to have been in the possession of the railway company and its successors, although one of them is marked "duplicate." These contracts bore no mark as having been introduced in the consolidated suit proceedings. Since neither the trustee's deeds nor the lost deed or deeds from the railway company to Kelley reserved the minerals, the trial court was justified in concluding that the parties did not intend to reserve the minerals.

■■ It is also manifest in this connection that neither Kelley nor his successors in title were parties to the aforementioned federal court proceedings, and of course were not bound by the trustee's deeds, unless by subsequent act or transactions they ratified or accepted them. Subsequent proceedings in the federal court and transactions between the parties at interest show that the deeds alone did not close the transactions, but that the execution and performance of the 1891 Wilson Live Stock Company contract terminated all transactions. Briefly, the record shows that in 1888, under order of the court, the title to all lands of the railway company, including the minerals in the lands in suit, if title thereto had not already passed to Kelley under the trustee's deeds and the lost deed or deeds, was conveyed to Olcott by the deed of the receiver and the mortgage holders. Possession was not delivered to Olcott for many years, but on application of Olcott the court ordered the receiver to continue to sell the lands of Olcott, to collect notes given for lands sold, and to execute deeds therefor. The record shows that in 1891 nothing had been paid on the last three of each series of the Kelley notes; and that appellee's father and predecessor in title, as president of the Wilson Live Stock Company, began negotiations with the railway company's land commissioner, who held the same position for the receiver, Olcott, and the newly organized railroad company, for a settlement of the Kelley notes and lands, and other sections of lands in the same block 23, sold by the railway company to one Curry, but then owned by said live stock company. The Curry lands had been deeded by the railway company with reservation of lien to secure the purchase-money notes, but with no reservation of minerals. The negotiations led to the execution, on February 1, 1891, of the Wilson Live Stock Company contract to purchase the Kelley notes, and for conveyance of all of the receiver's interest in the Kelley lands when the live stock company's notes had been paid. On the same date the Wilson Live Stock Company contracted to purchase the Curry by contract identical with the Kelley notes and land contract, except no provision was made to convey all the receiver's interest in the land upon payment of the Curry notes. This difference is significant in the contemporaneous contracts as showing the intention of the parties to convey any remaining interest that might be reserved by the Kelley contracts when the Wilson Live Stock Company paid the notes it had executed as consideration for the 1891 contract. The record shows that the receivership was closed before the last payment was due or made on the 1891 Wilson Live Stock Company contract, and it is probable that for that reason the conveyance provided for was not made. The record shows that Olcott and the new railroad company acquiesced in the perform-

ance of the 1891 contract, and that the last note was paid in 1898, whereupon the Kelley, notes, the Wilson Live Stock Company notes, and the trustee's deeds were delivered to McEntire. Correspondence between the aforementioned land commissioner for the receiver and all owners of the railroad properties, and the attorney for the newly organized railroad company, shows the efforts of McEntire to obtain at that time, 1898, a deed for the Kelley lands; and there is nothing in these letters to indicate that any one claimed a reserved interest in the minerals. And, since the Wilson Live Stock Company fully performed its contract, equity will regard the conveyance contracted for as having been made.

But appellant contends that it was a subsequent purchaser from Olcott, the mortgage holder, and the newly organized railroad, for value and without notice of the unrecorded 1891 Wilson Live Stock Company contract.

We doubt if the question of innocent purchaser is involved, but, if so, then the trial court found against the plea of innocent purchaser for value, and the evidence sustains the finding upon the ground that appellant's evidence was insufficient to show that the recited consideration of some $3,600 for the minerals in 80 or 90 sections of land was actually paid. A junior purchaser, to postpone a prior unregistered conveyance, must prove actual payment of the purchase money; recitals in his deed to that effect not being sufficient. Watkins v. Edwards, 23 Tex. 443; Ackers v. Frazier (Tex. Civ. App.) 220 S. W. 426. But, if we are correct in our view that the evidence sustains the conclusion of the trial court that the trustee's deeds to Kelley and the 1891 Wilson Live Stock Company contract conveyed both the legal and equitable title to the surface soil without any reservation of the minerals in the lands, then the question of innocent purchaser is not in the case, because the instrument or deed relied upon by appellant as conveying the minerals in question to it did not convey the minerals in any particular lands, but described them as follows: "The minerals, rights, privileges and easements herein contracted to be sold and conveyed to the party of the third part are those reserved in the sales of any and all tracts or parcels of land granted by the State of Texas to the Houston & Texas Central Railway Company and heretofore sold by the said Railway Company, the Receiver or Receivers thereof, in any and all counties of the State of Texas wheresoever the said lands may be situated."

It is manifest that from the form and language of this instrument or deed the burden was upon appellant to show what lands had been sold and conveyed by the railway company, or receiver thereof, with reservation of minerals before it could recover such reserved minerals. The trial court found upon sufficient evidence as aforementioned that the instruments relied upon by appellee conveyed the minerals in question to appellee's predecessors in title some 35 or 40 years prior to the execution of the instrument relied upon by appellant, and that appellant therefore failed to show any outstanding title to the minerals.

The trial court erroneously found and concluded that appellee McEntire had title to the minerals involved by virtue of the statutes of limitation pleaded. The possession of the lands by appellee and his predecessors in title was shown to be merely the ordinary possession of the surface to which they were entitled under their deeds and contracts to purchase; and this possession alone would not defeat by limitation the title to the minerals which were reserved by the reservation in the 1882 Kelley contracts. Elliott v. Nelson, 113 Tex. 62, 251 S. W. 501; Wallace v. Hoyt (Tex. Civ. App.) 225 S. W. 425; Green v. West Tex. Coal Co. (Tex. Civ. App.) 225 S. W. 548; Houston Oil Co. v. Pullen (Tex. Com. App.) 272 S. W. 439; Luse v. Boatman (Tex. Civ. App.) 217 S. W. 1096; Luse v. Parmer (Tex. Civ. App.) 221 S. W. 1031.

The judgments of the trial court are affirmed.

Affirmed.

## On Appellant's Motion for Rehearing.

Appellant contends on its motion for rehearing that we erred in finding that on August 20, 1885, the trustee, in pursuance of an order of sale by the court, and acting under the terms of the deed of trust, executed the two deeds of that date to Kelley. A careful review of the record sustains our finding. Appellant correctly complains that we erred in finding that the trial court specifically found that there were lost deeds from the railway company to Kelley. No specific finding as to lost deeds was made. But whether the trustee's deeds referred to lost deeds or to the 1882 Kelley contracts is not decisive of the case, because in either event the contract was executory, and was so considered by the parties to the 1891 Wilson live stock contract. This contract, as pointed out in the original opinion, was sufficient to, and was intended to, convey, upon its being performed, all interest in the land, including the minerals. The case presents purely a question of fact, and we hold that the judgment of the trial court is sufficiently supported by the evidence as pointed out in the original opinion.

Motion overruled.

Overruled.