## Rio Bravo Oil Company v. George H. McEntire et al.

No. 6539.   Decided June 24, 1936.
Rehearing overruled October 21, 1936.
(95 S. W., 2d Series, 381; 96 S. W., 2d Series, 1110.)

*W. A. Wright, Charles Russell, C. H. Tupper, Jr.,* of San Angelo, and *Baker, Botts, Andrews & Wharton,* and *S. H. German,* all of Houston, for plaintiff in error.

The Court of Civil Appeals erred in holding that the Trustee's deed conveyed the title to the minerals in the land in controversy because there was no reservation in said deed, when the description therein specifically limited the property conveyed to the property affected by the contracts of June 24, 1882, and August 12, 1882, which expressly reserved the minerals to the railway company. Gilbough v. Runge, 99 Texas, 539, 91 S. W., 566; Doty v. Barnard, 92 Texas, 104, 47 S. W., 712; Coal & Coke Co. v. Combs, 216 S. W., 846; Teagarden v. Godley Lumber Co., 105 Texas, 616.

*Kerr & Gayer,* of San Angelo, for defendant in error.

Even though a vendee could not confer upon his vendee a title that had never been conveyed to him, yet he could later convey to his vendee an interest formerly reserved by his vendor, if such reserved interest had been conveyed to him. Waco Bridge Co. v. Waco, 85 Texas, 320, 20 S. W., 137; Associated

Oil Co. v. Hart, 10 S. W. (2d) 791; Fennell v. Seguin St. Ry. Co., 70 Texas, 670, 8 S. W., 486.

MR. JUDGE SMEDLEY delivered the opinion of the Commission of Appeals, Section B.

The subject of controversy herein is the ownership of the minerals in sections 13, 23 and 25 in Block 23, Houston and Texas Central Railway Company lands in Sterling County, which sections of land were surveyed for the Houston and Texas Central Railway Company in the year 1867 and patented to it in the years 1884 and 1886. Defendant in error McEntire sued plaintiff in error for the title and possession of the three sections of land, alleging ownership under regular chain of title and also by virtue of the statutes of limitation of three, five, ten and twenty-five years. Defendant in error Gulf Production Company by intervention asserted its ownership of the oil and gas in section 23 and 25 under an oil and gas lease executed by McEntire and wife. Judgment of the trial court in favor of defendants in error was affirmed by the Court of Civil Appeals. 59 S. W. (2d) 962.

Aside from questions of limitation and innocent purchaser, the positions taken by the parties are, briefly stated: by plaintiff in error, that in sales of the land made by the patentee, the Houston and Texas Central Railway Company, in the year 1882 to one J. M. Kelley, through whom defendants in error claim, all minerals were excepted or reserved to the railway company and that defendants in error have never acquired title to the minerals; by defendants in error, that, through other instruments than the contracts of sale made in the year 1882 between the railway company and Kelley, they have title to the land, including the minerals, from and under the railway company.

These sections of land, together with other property owned by the railway company, were conveyed by the company in its "Consolidated Mortgage" executed October 1, 1872, to The Farmers Loan and Trust Company as trustee to secure the payment of its bonds in a large amount. It is apparent from the instrument that the conveyance was made for the sole purpose of securing the bonds, it being expressly provided that the conveyance was made upon the condition that upon payment of the bonds the estate granted to the trustee should be void and that the title should thereupon revert to and revest in the grantor, its successors or assigns, without reconveyance. The deed of trust empowered the trustee in the event of default on

the part of the railway company to institute proceedings in a proper court to procure decree of sale of the property or so much thereof as might be necessary to meet the payment in default. It also provided that the trustee upon default might sell the land, or so much thereof as might be necessary, at public or private sale and without legal proceedings, after publication of notice, and authorized it upon such sale to execute a deed conveying the property free of encumbrance and the claims or equities of the railway company. The deed of trust reserved to the railway company the right upon certain conditions to sell the lands covered by it. Such conditions were in substance: that sales should be for certain minimum prices; that sales should be reported to the trustee and at least ten per cent of the consideration paid to it; and that bonds and mortgages securing the balance of the consideration should be delivered to it. It was provided that thereupon the trustee "should execute and acknowledge a deed conveying to such purchaser, his heirs and assigns all the right, title, interest, estate and property of the said trustee of, in and to the section or parcel of land so sold."

On June 24, 1882, the railway company, apparently without undertaking to comply with the conditions set out in the deed of trust, entered into a contract of sale of section 23 (one of the three sections in controversy) with J. M. Kelley. This instrument executed both by the railway company and by Kelley is in form a contract. It recites that the railway company agrees to sell the section of land to Kelley for a consideration of $320.00 in cash, and like payments to be made in one, two, three and four years, such deferred payments being evidenced by four promissory notes bearing interest at 8%. Kelley agrees to make punctual payment of the notes and of all taxes and assessments lawfully imposed. The instrument provides that in case the notes are paid the railway company will execute to Kelley a deed conveying the premises with special warranty "but made subject to the following rights of the said railway company, each and all of which rights are hereby reserved and are not to pass by the deed to be made by said railway company." One of the rights so reserved is described as a railway right of way 200 feet in width over the land conveyed. The other rights reserved are mineral rights described in a long paragraph, the first part of which is as follows:

"The Houston and Texas Central Railway Company reserves the right at all times hereafter to enter upon the land hereby conveyed and prospect for and make surveys at will,

and any part of it for coal, mineral, stone, or any other valuable deposits, and to open upon said land and operate with all machinery, appliances and attachments which it may deem necessary, mines, borings and quarries; and the coal, mineral, stone or other valuable deposits found in and taken from all such mines, borings and quarries shall be the property of said Houston and Texas Central Railway Company, and it shall have the right to remove the same, and for the purpose of ingress and egress to and from such mines, borings and quarries, a further right of way over the land hereby conveyed sixty feet in width to and from such mines, borings and quarries is hereby reserved;"

Then follow in the same paragraph detailed regulations with respect to the use and enjoyment of the reserved mineral rights. After the paragraphs containing the reservations the instrument contains the following:

"The said Joseph M. Kelley by accepting this deed agrees to the reservation aforesaid and to the entire contract hereinabove specified and covenants to and with the said Railway Company and its assigns that it and they shall have and enjoy all the reservations, rights and privileges contained and contracted for in this deed and further agrees that this covenant shall run with the land hereby sold, and it is stipulated in this agreement that no assignment of the premises shall be valid unless the same shall be endorsed hereon."

On August 12, 1882, another contract of sale in substantially the same language as the contract of June 24, 1882, was made between the railway company and J. M. Kelley for the sale to Kelley of the other two sections of land in controversy herein, sections 13 and 25, the consideration recited being $576.00 in cash and the execution by Kelley of four notes each in the sum of $576.00 due one, two, three and four years after date. The first of these contracts of sale was filed for record December 17, 1886; the second was filed for record October 4, 1929. Both contracts were executed in duplicate, and plaintiff in error offered in evidence the copies which were retained by the railway company. The copy of the contract of June 24, 1882, was endorsed: "Contract No. 31½C," and the copy of the contract of August 12, 1882, was endorsed "Contract No. 58C."

The eight original notes given by Kelley as part of the consideration for the land sold to him were offered in evidence by defendant in error McEntire. Each of the four notes in the sum of $320.00 contained the recital that it was given in part

payment for section 23 "sold and conveyed to me by said Houston and Texas Central Railway Company by contract No. 31½C bearing date the 24th day of June, 1882, and is secured by a vendor's lien on said property, as retained in said contract." The four notes in the sum of $576.00 each contained recitals in the same language, but referred to sections 13 and 25 sold and conveyed by contract No. 58C dated August 12, 1882.

In the early part of the year 1885 four suits were filed in the United States Circuit Court against the Houston and Texas Central Railway Company for foreclosure of deed of trust liens upon its property, one of these suits being for foreclosure of the lien created by the deed of trust of October 1, 1872, hereinabove described; and in these suits receivers were appointed. In each of the four suits an order was entered May 7, 1885, one of the purposes of which was to give the respective trustees the opportunity, if they deemed it advisable to do so, to ratify sales of land which had been made by the railway company without the consent or knowledge of such trustees. The order recited that such sales had been made and that the proceeds of the sales, or part of same, consisting of cash and of notes given by purchasers were in the possession of the receivers. It was ordered and adjudged that the trustees were entitled to the proceeds of such sales upon their affirmance of the sales and the delivery of deeds by them; that the receivers should render duly verified accounts of all sales and contracts of sale of any of the lands and of all monies or other consideration received or taken from any person in connection with the sales; that within a reasonable time the trustees should elect whether or not to ratify the sales and investment; and that upon their electing to ratify, all cash in the hands of the receivers from such sales and from the collection of notes given for the land should be delivered to the respective trustees; that the receivers should proceed to collect notes in their possession representing credit portions of such sales already made and pay over the proceeds of the notes to the trustees respectively as fast as collected; and that the trustees respectively should deliver to the receivers deeds to the purchasers of the land so sold, the deeds to be held by the receivers and delivered whenever the purchasers had paid for the lands in full.

Pursuant to the foregoing order The Farmers Loan and Trust Company on August 20, 1885, executed and delivered to J. M. Kelley two "deeds of release," one affecting section 23 and the other sections 13 and 25. These two instruments are

identical in their terms and provisions. They begin with recitals about the several deeds of trust and the pendency of the foreclosure suit. They make reference to the order of May 7, 1885, describing the terms of that order substantially as they have been described above. The instruments then recite: that the receiver did render his account as provided in said order; that The Farmers Loan and Trust Company did present its petition to the court asking the court for advice; and that the court after consideration of the petition "made an order that the ratification of said sales and investments as set forth in the said petition be confirmed and approved by the court, and that the terms of said order of May 7, 1885, as regards the execution and delivery of deeds, payment of funds, cancellation of bonds, and in all other respects, be carried out and performed by the said receivers and by the party hereto of the first part as trustee as soon as practicable." Following these recitals the conveying or releasing clause of the instruments is as follows:

"NOW, THEREFORE, THIS INDENTURE WITNESSETH, that the party hereto of the first part, in consideration of the premises and of the payment made to it by the said receivers in pursuance of the above order, and of the sum of one dollar to it in hand paid by the party hereto of the second part, the receipt whereof is hereby acknowledged, hath granted, demised, released and quitclaimed, and, by these presents, doth grant, demise, release and quitclaim unto the party of the second part, and to his heirs and assigns forever, all that certain lot, piece or parcel of land and property situate, lying and being in the county of Tom Green in the State of Texas, known and described as follows, namely:"

The land is described in one of the instruments thus:

"All of Section 23, Block 23, Certificate 1012 containing 640 acres, deeded to party of second part by the Houston and Texas Central Railway Company on the 24th day of June, 1882, by Deed No. 31½C, at the price of Two Dollars and fifty cents per acre."

The description in the other instrument is:

"All of Sections 13 and 25, Block 23, Certificates 1007 and 1013 containing 1280 acres, deeded to party of the second part by the Houston and Texas Central Railway Company on the 12th day of August, 1882, by Deed No. 58C at the price of two dollars and twenty-five cents per acre."

These two deeds of release were delivered to W. R. McEntire, father of defendant in error George H. McEntire, by C. C. Gibbs, Land Commissioner for the Houston and Texas

Central Railroad Company on March 11, 1898, which the record indicates was a short time after final payment was made of the indebtedness originally evidenced by the eight notes given by J. M. Kelley in 1882.

The several foreclosure suits against the Houston and Texas Central Railroad Company were consolidated, and by an order made in the consolidated cause on May 26, 1886, three receivers were appointed, one of them Charles Dillingham. The order gave the receivers authority to continue to make under the direction of the court contracts for the sale of land in their possession belonging to the railway company; and it directed them, as to sales of land already made, to keep separate and accurate records, to proceed to collect notes representing credit portions of such sales, to pay over the proceeds of such notes to the trustees respectively, and to deliver to the purchasers when the lands were paid in full the deeds which had been executed by the respective trustees.

A decree foreclosing the several deeds of trust and ordering the sale of the property covered by them was entered May 4, 1888, and pursuant to that decree the property and lands, except such portion of the land as had already been sold, were sold to F. P. Olcott. The report of sale was approved and confirmed and on January 18, 1889, the land and other property sold were conveyed to Olcott by Charles Dillingham as Special Master Commissioner. Pending the perfecting of a plan for the reorganization of the railway company Dillingham, who had become sole receiver, remained in possession of the property, including that which had been sold and conveyed to Olcott, until sometime after February 1, 1891. An order entered December 7, 1888, authorized Dillingham, as receiver and until the property should be delivered to Olcott, to collect for the parties in interest the land notes in his possession and on the payment of the notes to execute releases of the mortgages securing the notes, and further authorized him to make sales of and deeds to lands in his possession which had been sold to Olcott, reporting such sales, however, to Olcott and to The Farmers Loan and Trust Company, for approval.

On February 1, 1891, Dillingham as receiver, being in possession of the unpaid notes given by Kelley in 1882 as part of the consideration for the three sections of land, entered into a written contract with The Wilson Live Stock Company, which at that time owned or claimed the three sections of land under chain of title from Kelley. This contract makes reference to the two contracts of sale, one of June 24, 1882, and the other

of August 12, 1882, by which Kelley bought the three sections of land from the railway company and to the notes. given by Kelley as part of the consideration. It recites that there were reserved in said contracts special liens to secure the payment of the notes and that on all of the notes there is due, principal and interest to February 1, 1891, the total sum of $4304.15. By the terms of the contract Dillingham as receiver agrees to assign and transfer to The Wilson Live Stock Company the said notes upon payment by said company of the full amount due on the notes, the same to be paid as follows: $860.83 in cash upon the execution and delivery of the contract; and the balance in four equal installments of $860.83 each, to be paid on or before one, two, three and four years respectively after February 1, 1891, with interest at 6%. The said payments to be made were evidenced by four notes each in the sum of $860.83 payable to Charles Dillingham, receiver, and executed by The Wilson Live Stock Company. By the terms of the contract The Wilson Live Stock Company bound itself to accept the Kelley notes and to pay for the same at the times and in the amounts and upon the terms stated. The contract further provided that in the event of default in any of the annual payments Dillingham, receiver, or other holder of the notes, was authorized to foreclose the lien given to secure the notes. The last paragraph of the contract is as follows:

"It is further understood that the party of the first part, his successors or assigns are to deliver said notes to the party of the second part, its successors or assigns when the consideration hereinbefore mentioned has been paid in full. When the Wilson Live Stock Co. shall have paid off in full the notes herein described, then the party of the first part, his successors or assigns shall assign and transfer to the party of the second part, its successors or assigns all of his interest in said lands."

Final payment of the debt evidenced by the original notes given by Kelley and by the new notes given by The Wilson Live Stock Company was made in the early part of the year 1898 and on March 11, 1898, C. C. Gibbs, Land Commissioner of the Houston and Texas Central Railroad Company, successor to the Houston and Texas Central Railroad Company, delivered to W. R. McEntire, who had become the owner of the three sections through deed from The Wilson Live Stock Company, the last six of the original notes given by Kelley, the last of the four notes executed by The Wilson Live Stock Company, and the deeds of release executed by The Farmers Loan and Trust Company to Kelley in 1885. Gibbs stated in his letter trans-

mitting the notes and deeds of release that a deed for execution by the Houston and Texas Central Railway Company conveying the lands sold under the contract to Kelley had been forwarded to New York, but there is no evidence in the record that would support a finding that any deed was executed by the Houston and Texas Central Railway Company conveying the three sections of land to Kelley, or to anyone holding under him, after the execution of the two contracts of sale to Kelley in 1882. And there is no evidence in the record that Dillingham, or his successors or assigns, ever executed the assignment or transfer agreed in the contract of February 1, 1891, to be made upon full payment of the Kelley notes.

■ The Court of Civil Appeals correctly held that the language used in the reservation of minerals in the contracts by which the railway company in 1882 sold the land to Kelley was sufficient as a matter of law to include oil and gas. Elliott v. Nelson, 113 Texas, 62, 251 S. W., 501; Luse v. Boatman, 217 S. W., 1096 (application for writ of error refused); Warner v. Patton, 19 S. W. (2d) 1111 (application for writ of error refused).

We do not approve the conclusion of the Court of Civil Appeals that the deeds of release from The Farmers Loan and Trust Company to Kelley in 1885 had the effect of conveying to him title to the minerals. It is our opinion that the court's order, the deeds of release, the surrounding circumstances, and the several transactions detailed above show beyond question that these instruments were intended by the court and by the parties to them to have only the effect of ratifying and confirming the sale theretofore made to Kelley and, as a part of such ratification and confirmation, of releasing the three sections of land from the lien created by the deed of trust executed in 1872. There was no intention to sell, convey or release to Kelley any other property or estate than what he had bought, or contracted to buy, in 1882.

The deeds from The Farmers Loan and Trust Company to Kelley were not made under the trustee's power to sell and convey upon default in the payment of principal or interest due on the bonds. They were executed, as their recitals plainly state, pursuant to the court's order of May 7, 1885, and for the purpose of ratifying and confirming the prior unauthorized sales made by the railway company to Kelley. The effect of the order authorizing the trustee to ratify the sales and of the deeds of release made pursuant to the order was that the trus-

tee accepted for the bondholders, in lieu of the original lien created in 1872 by the deed of trust, in so far as it affected the three sections of land which had been sold to Kelley, the purchase money notes given by Kelley and the liens securing them. The deeds of release were executed as a part of this ratification of the prior sales and to make the ratification effective and not for the purpose of making new sales or of enlarging Kelley's purchase.

As has been shown, the deed of trust provided that the railway company might make sales of the lands covered by the deed of trust by complying with specified conditions and that when any such sale was so made the trustee should execute a deed conveying to the purchaser all of its title, estate and property in the land so sold. It was evidently the purpose of the court in authorizing the ratification of the unauthorized sales and the execution of deeds by the trustee, and of the trustee in ratifying the sales and in executing the deeds of release, to place the purchaser substantially in the same position he would have occupied had the sales been made originally in accordance with the prescribed conditions.

■ In this State a deed of trust given to secure a debt is in legal effect a mere mortgage with power to sell. Title remains in the grantor subject to the lien created by the deed of trust for the payment of the debt. McLane v. Paschal, 47 Texas, 365; Fuller v. O'Neal, 69 Texas, 349, 6 S. W., 181, 5 Am. St. Rep,. 59; 29 Tex. Jur., pp. 791-792, Sec. 5. The court's order of May 7, 1885, the ratification by the trustee of the sales that had been made to Kelley, and the trustee's approval of the notes given by Kelley in part payment for the land satisfied the lien created by the deed of trust of 1872 in so far as it affected the three sections of land. The trustee had no further interest, under the deed of trust, in the three sections, and the execution of the deeds of release was merely a formality to clear the title.

■ The use in the court's order of the word "deeds" and in the deeds of release of the words "grant" and "granted" cannot serve to invest Kelley with title to property or an estate that he did not acquire in his purchase from the railway company, when the court's order and the deeds of release considered in their entirety distinctly disclose an intention merely to ratify and confirm the original sales. Cook v. Smith, 107 Texas, 119, 174 S. W., 1094, 3 A. L. R., 940; Ogletree v. Abrams (Com. App.), 67 S. W. (2d) 227; Sisk v. Randon, 123 Texas, 326, 70

S. W. (2d) 689; Sun Oil Co. v. Burns, 125 Texas, 549, 84 S. W. (2d) 442.

The conclusion expressed herein as to the effect of the deeds of release, that is, that they did not convey the mineral rights which had been reserved in the sales by the railway company to Kelley, is supported by Humphreys-Mexia Company v. Gammon, 113 Texas, 247, 254 S. W., 296, 29 A. L. R., 607. In that case a conveyance of land reserved the minerals and also retained a vendor's lien to secure payment of part of the purchase price represented by notes. The grantor thereafter sold the notes and executed a written assignment of them, which, while it showed by its recitals that its purpose was to transfer the notes and the lien and the legal title retained to secure the notes, also contained words to the effect that the grantor bargained, sold and quitclaimed all of his right, title, interest and estate, both legal and equitable, in and to the land. The contention was made that the assignment gave the assignee title to the minerals which had been reserved by the grantor, but the court gave the instrument a common sense construction to effectuate the intention of the parties and held that it conveyed the notes, the lien given to secure them, and the naked title retained for the same purpose and did not convey the minerals.

A similar decision, also supporting the conclusions expressed herein, was made in Sanborn v. Crowdus Brothers & Company, 100 Texas, 605, 102 S. W., 719, where the court held that a release had the effect only of releasing a lien which had been retained against land formerly conveyed by the grantor, although it contained words which ordinarily would have been sufficient to pass the grantor's title to other land. In so holding the court gathered the grantor's intention from the recitals in the release and from the language of the deed to which it referred. The statement of Associate Justice Williams in the opinion in that case that "Nowhere does an intention appear to make a new grant of anything" has peculiar application to the deeds of release construed in the present case.

Nor do we find anywhere an intention to make a new grant or a new sale of anything by or through the performance of the contract of February 1, 1891. When that contract was made between Dillingham, receiver, and The Wilson Live Stock Company, which owned or claimed the three sections of land under chain of title from Kelley, the last three of each of the two series of notes given by Kelley were past due and unpaid and Dillingham as receiver had possession of the notes and was

authorized to collect them for the parties at interest. The notes were secured by liens reserved to secure their payment. The contract made was that Dillingham would assign and transfer the Kelley notes to The Wilson Live Stock Company upon the payment by that company, its successors or assigns, of the full amount of the principal and interest due on said notes to February 1, 1891, being $4304.15. It was provided that this amount should be paid one-fifth on the execution of the contract and the balance in four equal annual installments, and notes were executed to evidence such annual payments. This was a renewal and an extension of the original notes given by Kelley. It was so regarded by the parties, the Kelley notes being retained and surrendered to W. R. McEntire, together with the two deeds of release which had been executed in 1885 and the last of the new notes, when final payment of the debt was made in 1898.

That clause of the contract of February 1, 1891, by which Dillingham, receiver, agreed, when the notes were paid in full, to assign and transfer to The Wilson Live Stock Company, its successors and assigns, all of his interest in the land, is to be construed in connection with the recitals with respect to the original purchase by Kelley and the other clauses and provisions of the contract. When it is so construed, it is apparent that the intention of the parties to the contract was to extend and renew the Kelley notes and to assign and transfer them to The Wilson Live Stock Company, together with the lien securing them, upon full payment of the debt as evidenced by the new notes, and not to accomplish a sale or conveyance of a new or different interest or estate. See Humphreys-Mexia Co. v. Gammon, and Sanborn v. Crowdus Brothers & Company, supra. Such assignment of the Kelley notes and the lien securing them to the owner of the land under chain of title from Kelley, after payment of the debt as evidenced by the renewal notes, would have the effect, of course, of extinguishing the lien securing the original notes and was nothing more than an indirect method of releasing the lien.

■ The Court of Civil Appeals correctly held that defendant in error and his predecessors in title acquired no tile to the minerals in the land through their posession and use of the surface, since such possession and use were exercised after the minerals had been severed by the reservations in the Kelley contracts of 1882. Elliott v. Nelson, 113 Texas, 62, 251 S. W., 501; Luse v. Boatman, 217 S. W., 1096 (application for writ of error re-

fused); Wallace v. Hoyt, 225 S. W., 425 (application for writ of error refused).

■ The Kelley contracts were not contracts for the sale of the land at a future time, but the contracts, together with the notes contemporaneously executed by Kelley for part of the purchase price, evidenced present sales and gave to Kelley an equitable title to the land with right of posession. The purchaser and his successors went into possession of the land and held it for a long time before final payment of the purchase money was made. The contracts bound the purchaser to pay all taxes and assessments thereafter lawfully imposed upon the premises. The reservations of rights of way and of minerals contained in the contracts were not merely agreements that such reservations would be incorporated in deeds thereafter to be made but they were reservations presently made, the language used being that "each and all of which rights are hereby reserved." Each note given by Kelley at the time the contracts were executed stated that it was given in part payment for the land, describing it, "sold and conveyed to me by said Houston and Texas Central Railway Company by contract," giving the number of the contract and its date and stated further that it was "secured by a vendor's lien on said property as retained in said contract." These contracts and notes accomplished a present sale of the land with reservation of the minerals and retention of vendor's lien and worked as effective a severance of the minerals from the surface as would have been made by an instrument in the form of a deed conveying the land with similar reservation of minerals and retention of vendor's lien. Humphreys-Mexia Company v. Gammon, 113 Texas, 247, 254 S. W., 296, 29 A. L. R., 607; Munsey v. Mills & Garitty, 115 Texas, 469, 283 S. W., 754.

■ The Gulf Production Company's claim that it is an innocent purchaser of the oil and gas by virtue of its oil and gas lease from defendant in error McEntire cannot be sustained, because it took under the lease only such title as McEntire had to the oil and gas. McEntire had no title, either legal or equitable, to the oil and gas, because title to the minerals was reserved by the railway company when it sold the land to Kelley, under whom McEntire acquired his title, and as has been held, McEntire did not acquire the minerals through the deeds of release executed in 1885 or under the contract of 1891 or by adverse possession.

The judgments of the district court and of the Court of

Civil Appeals are reversed. Judgment is here rendered as follows: in favor of defendant in error George H. McEntire against plaintiff in error Rio Bravo Oil Company for the title and possession of the three sections of land described in said defendant in error's first amended original petition, save and except the minerals, including oil and gas, in, on and under said land, and save and except the rights to use the surface of said land for prospecting for, developing and removing said minerals, and save and except a railway right of way 200 feet in width over said land, as said rights and right of way are reserved and described in the contract between the Houston and Texas Central Railway Company and Joseph M. Kelley of date June 24, 1882, and in the contract between the same parties of date August 12, 1882, as said contracts are recorded in Volume 2, pages 16-21, deed records, Tom Green County Transcript, of Sterling County, Texas, and in Volume 26, pages 482-486, deed records of Sterling County, Texas; that as to the minerals, including oil and gas in, on and under said land, and as to the said rights to use the surface and railway right of way as reserved and described in said contracts, defendant in error George H. McEntire take nothing; and that defendant in error Gulf Production Company take nothing by the suit or cause of action alleged in its petition in intervention.

Opinion adopted by the Supreme Court June 24, 1936.

### ON REHEARING.

Defendant in error McEntire in motion for rehearing questions the correctness of the construction given in the original opinion to the reservations contained in the contracts by which the Houston and Texas Central Railway Company sold the three sections of land to J. M. Kelley. Since the parties failed to discuss in their briefs the meaning of these reservations further than to contend, the one that the contracts reserved all of the minerals, including oil and gas, and the other that they did not, they were requested to file and have filed additional written arguments.

After careful consideration of the motion for rehearing and the written arguments, we adhere to the ruling made in the original opinion that the Kelley contracts and notes were effective to accomplish present sales of the land with reservations by the vendor of all of the minerals, including oil and gas, and of such rights to use the surface as were set out in the contracts. No effort was made to describe these rights in detail and neither the opinion nor the judgment was intended to deny

to the vendee or his assigns the privilege given to him by the contracts, under the conditions and upon the payment of the royalty specified, to operate for and remove minerals from the land.

■ The privilege of taking minerals, which a paragraph of each of the contracts gives to the vendee, is expressly subordinate to the vendor's reservation of title to the minerals and it may be exercised only under certain prescribed conditions and upon the payment to the vendor, the owner of the minerals, of five per cent of all minerals taken. Defendant in error interprets this paragraph as giving to the vendee title to ninety-five per cent of the minerals. On the contrary it recognizes the vendor's ownership of all of the minerals as theretofore reserved in the same instrument and gives to the surface owner a restricted privilege to take minerals from the land provided he pays five per cent as royalty to the owner of the minerals.

The provision contained in each of the contracts of sale that the vendor in the locations made for mineral development shall never occupy in the aggregate more than a certain number of acres of the surface of the land conveyed does not modify or restrict the reservation of title to all of the minerals. Clearly it was intended merely as a limitation upon the amount of the surface, exclusive of the rights of way, that might be used at any one time by the vendor.

The deed construed in States Oil Corporation v. Ward (Com. App.), 236 S. W., 446, contained a reservation of the minerals in the same language as that used in the Kelley contracts, except that it failed to specify the aggregate number of acres that might be occupied in mineral development. The court held that the deed reserved to the grantor the present title to all of the minerals.

As to the contention of defendant in error that the rights of way expressly reserved in the Kelley contracts have been extinguished by adverse possession, it is our opinion, after careful consideration of the evidence, that defendant in error, who was plaintiff in the trial court, failed to prove that the possession shown was commenced and continued under claim of right inconsistent with and hostile to the rights to use the surface which were reserved in the contracts.

The motion for rehearing is granted to the extent of incorporating in the judgment heretofore rendered herein a provision that defendant in error George H. McEntire is adjudged to have and own, as incident to his ownership of the surface

of the three sections of land, the privilege to prospect for and take minerals from the land, subject to the reservations made by the vendor in the contracts between Houston and Texas Central Railway Company and Joseph M. Kelley described in the judgment and under the restrictions and conditions and upon payment of the royalty as set out and specified in said contracts. In all other respects the motion for rehearing is overruled.

Opinion adopted by the Supreme Court October 21, 1936.