

Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# OPINION ON REHEARING

No. 04-06-00478-CV

**BP AMERICA PRODUCTION COMPANY**,
Atlantic Richfield Company, and Vastar Resources, Inc.,
Appellants

v.

Stanley G. **MARSHALL** Jr., Robert Ray Marshall, Catherine Irene Marshall
f/k/a Catherine I.M. Hashmi, and Margaret Ann Marshall f/k/a Margaret A.M. Jeffus,
by and through David Jeffus, as Independent Executor of the Estate of Margaret Marshall,
Appellees

&

**VAQUILLAS RANCH CO., LTD.**, Vaquillas Unproven Minerals, Ltd.,
and Vaquillas Proven Minerals, Ltd.,
Appellants

v.

**WAGNER OIL COMPANY** f/k/a Duer Wagner & Co., Jacque Oil & Gas Limited,
Duer Wagner, Jr., Duer Wagner III, Bryan C. Wagner, James D. Finley, Dennis D. Corkran,
David J. Andrews, H.E. Patterson, Brent Talbot, Scott Briggs, and Gysle R. Shellum,
Appellees

From the 49th Judicial District Court, Zapata County, Texas
Trial Court No. 4091
Honorable Manuel R. Flores, Judge Presiding

Opinion by:    Steven C. Hilbig, Justice

Sitting:       Karen Angelini, Justice
               Rebecca Simmons, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:   December 10, 2008

AFFIRMED IN PART, REVERSED AND REMANDED IN PART; APPELLANTS' MOTION FOR REHEARING GRANTED IN PART AND DENIED IN PART; APPELLEES' MOTION FOR REHEARING DENIED.

This matter involves two appeals from a single judgment. While the appeals are from the same judgment, we recognized in our opinion and judgment issued July 23, 2008, that they are independent of one another with regard to the issues presented, the analysis required, and the disposition. Accordingly, we addressed each appeal separately, affirming in part and reversing and remanding in part. Appellants, Stanley G. Marshall Jr., Robert Ray Marshall, Catherine Irene Marshall, and Margaret Ann Marshall, filed a motion for rehearing, which we grant in part and deny in part. Appellees, Wagner Oil Company f/k/a Duer Wagner & Co., Jacque Oil & Gas Limited, also filed a motion for rehearing, which we deny. We withdraw our July 23, 2008 opinion and judgment and issue this opinion and judgment in its place.

## BP AMERICA/MARSHALL APPEAL

### INTRODUCTION

This appeal concerns the portion of the judgment rendered in favor of Stanley G. Marshall Jr., Robert Ray Marshall, Catherine Irene Marshall, and Margaret Ann Marshall (the "Marshalls"). The Marshalls, grantors of an oil and gas lease, brought suit claiming the lease had terminated pursuant to its terms, but the termination was fraudulently concealed. The jury found in favor of the Marshalls and the trial court entered judgment on the verdict. BP America Production Company, Atlantic Richfield Company, and Vastar Resources, Inc. ("BP America")[1] raise numerous issues

---

[1] In 1993, Atlantic Richfield Company ("ARCO") "spun-off" most of its south Texas and Gulf of Mexico interests to Vastar Resources, Inc ("Vastar"). ARCO and Vastar were subsequently acquired by BP America, Inc. Vastar was merged into an entity know as BP America Production Company. Given there is no dispute regarding the connection between these entities, we collectively refer to them as BP America.

contesting the portion of the judgment in favor of the Marshalls. We reverse the trial court's award of a future accounting without imposition of costs and the award of attorney's fees to the Marshalls, but affirm the trial court's judgment as to the remainder of the Marshalls' claims.

### FACTUAL AND PROCEDURAL BACKGROUND

The Slator Ranch ("the Ranch") is a 17,712 acre tract of land located in Webb and Zapata counties. The surface of the Ranch is owned by Vaquillas Ranch Co., Ltd. Fifty percent of the undivided minerals underlying the Ranch were owned by Tenneco; the other fifty percent were owned by a number of individuals and entities, including the Marshalls and the Vaquillas entities. The Marshalls collectively owned 1/16th or 6.25% of the undivided minerals under the fifty-percent of the Ranch not owned by Tenneco.

Between 1973 and 1975, BP America obtained fifteen oil and gas leases on the fifty percent of the Ranch not owned by Tenneco. One of those leases was with the Marshalls ("the Marshall Lease"). The primary term of the Marshall Lease was five years and it expired on July 11, 1980. The lease had a standard "sixty-day clause," which provided the lease would not expire so long as the lessee was engaged in drilling or reworking operations designed to produce paying quantities of oil or gas with no cessation of such work for more than sixty days.

By May of 1980, BP America was concerned about the expiration of its leasehold interests, including the Marshall Lease, because no production had resulted from its efforts. Evidence established that if BP America was forced to renew the leases, it would cost as much as $800,000.00 and result in a doubling of the royalties due the lessors, presuming the lessors agreed to renew. In an apparent attempt to perpetuate its leases under the savings clause, BP America began working on

a well designated J.O. Walker No. 1.  Drilling or "spudding"[2] began on June 26, 1980, less than two weeks before the leases were to expire.  There was evidence presented showing that the focus of the J.O. Walker No. 1 was the portion of the strata identified as the Lower Wilcox because it was believed profitable production might be obtained from there.  The Middle Wilcox was a secondary objective.  BP America never identified the Upper Wilcox as an objective of the J.O. Walker No. 1.  When BP America reached the Lower Wilcox and its final drilling depth of 12,267 feet on September 22, 1980, it found nothing.  To use BP America's term, the Lower Wilcox was "faulted out."  BP America then went back up the well to see if the Middle Wilcox might contain producible gas.  BP America claims the work on the Middle Wilcox continued through January of 1981; however, its own file characterized completion efforts in the Middle Wilcox as "unsuccessful" as early as December 22, 1980.  According to the Marshalls, BP America's efforts with regard to the Middle Wilcox from mid-October to late January consisted of merely sending someone out to the well on occasion to open a valve and wait around while the well quickly "blew down to zero" pressure and streamed water.  The Marshalls' experts testified this was a classic sign the well was not going to produce and BP America should have known this by December 4, 1980.  According to the Marshalls, any actions taken by BP America after that date were taken with the knowledge there was no chance the Middle Wilcox would produce gas in paying quantities.  BP America contended it was properly working to obtain production and all its efforts were undertaken in good faith.

With no production from the Lower or Middle Wilcox, BP America needed to decide its future course of action.  There was evidence BP America did not want to spend money drilling

---

[2] Webster's defines the verb "spud" as "to begin to drill (an oil well)."  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1143 (1984).

additional wells on its own, but it needed to continue operations to avoid expiration of the leases.

A proposed farmout was considered. On January 16, 1981, BP America approved a memo stating:

> We have no plans to participate in any further development of this acreage . . . It is the Land Department's recommendation that we grant the farmout since this will probably be the only way we can hold on to this acreage without incurring expensive reacquisition costs.

The evidence showed there was a delay in finalizing a farmout agreement so BP America needed to take some action to prevent the loss of the leases through operation of the sixty-day clauses. Despite the fact that it had apparently never identified the Upper Wilcox as an objective of J.O. Walker No. 1, BP America took steps to test the Upper Wilcox. According to BP America, work on the Upper Wilcox began on February 2, 1981, and continued through March 5, 1981. This portion of the well was also found to be unproductive. BP America contended its work on the Middle and Upper Wilcox was a good faith effort to obtain commercial production thereby extending the leases, including the Marshall Lease. The Marshalls claim BP America had known since August 1980 that the Upper Wilcox was incapable of generating commercial production and thus its activities on this portion of the well could not be counted when calculating whether BP America had ceased operations for a consecutive sixty-day period on the Marshall Lease.

On March 25, 1981, BP America finalized a farmout agreement with Sanchez-O'Brien. On that very same day, BP America determined the J.O. Walker No. 1 well should be plugged and abandoned. Sanchez-O'Brien spudded a new well on April 13, 1981, which ultimately produced gas in paying quantities. BP America asserted this action, along with its previous actions, allowed the Marshall Lease to continue in effect and the sixty-day clause was never implicated. The Marshalls' experts opined that BP America ceased operations on J.O. Walker No. 1 on December 4, 1980, because BP America did not thereafter engage in good faith efforts to produce paying quantities of

oil or gas from the well. In essence, the Marshalls claimed BP America conducted make-work operations on the well simply to give the appearance of continuing operations to avoid application of the sixty-day clause.

On June 25, 1981, Stanley Marshall called BP America because he had not heard anything from BP America regarding completion of any well on the Marshall Lease. Stanley testified he intended to ask "for a release" so he could try to lease to someone else. He was transferred to a man named H.F. Young. According to Stanley, Young responded that there had been continuous operations and the lease was still in effect. Young promised to look at the file and send Stanley Marshall a written report.

By letter dated June 29, 1981, Young sent Stanley Marshall a report allegedly summarizing the activities undertaken by BP America on the lease. Young provided information with regard to the only well it drilled during the lease term, J.O. Walker No. 1, and also advised that Sanchez-O'Brien had spudded a second well. According to Stanley Marshall, he relied on this letter and concluded the lease with BP America was still in effect. However, according to the Marshalls, they later learned that Young's letter wholly failed to disclose certain information and contained misleading half-truths, all designed to make the Marshalls believe BP America had continuously engaged in good faith efforts to obtain production from the well, there had been no cessation in operations for sixty days, and the lease was still in effect. According to Stanley Marshall, he would have undertaken an investigation to determine the true nature of BP America's operations and the true status of the Marshall Lease had BP America made full disclosure.

In 1997, Vaquillas Ranch Co., Ltd., Vaquillas Unproven Minerals, Ltd., and Vaquillas Proven Minerals, Ltd. ("Vaquillas"), lessors similarly situated to the Marshalls, filed this suit against

BP America and others. Vaquillas ultimately alleged its lease with BP America had terminated because BP America's operations on J.O. Walker No. 1 were not conducted in a good faith effort to obtain production in paying quantities. The Marshalls intervened in the suit in August 2001. The Marshalls alleged their lease had terminated and BP America had defrauded them by purposefully concealing facts and circumstances demonstrating the lease had terminated. Vaquillas settled with and dismissed its claims against BP America. The Marshalls' claims against BP America were tried before a jury.

The jury found BP America failed to conduct operations on J.O. Walker No. 1 well for more than sixty consecutive days between December 4, 1980, and April 13, 1981. "Operations" was defined in the jury charge as "any and all actual acts, work, or operations in which a reasonable prudent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil and gas in paying quantities." The jury also found BP America had defrauded the Marshalls and answered all statute of limitations questions in their favor.

Based upon the jury's verdict, the trial court rendered judgment in favor of the Marshalls. The Marshalls obtained the following relief: (1) a declaration the Marshall Lease had terminated; (2) based on the termination, declarations that BP America's property interest had terminated and the interests reverted to the Marshalls; (3) court-ordered accountings and a transfer of an overriding royalty interest; (4) past compensatory damages; (5) attorney's fees; and (6) prejudgment and post-judgment interest.

BP America appeals from this judgment raising numerous issues arguing generally: (1) the fraud claim should be reversed; (2) there is legally insufficient evidence to support the jury's finding that the Marshall Lease terminated; (3) the statute of limitations governing implied covenants under

an oil and gas lease bars the Marshalls' claim that the lease terminated, and the discovery rule either does not apply or its elements were not proven, or fraudulent concealment was not established; (4) error in the trial court's order that BP America account to the Marshalls; (5) error in the award of attorney's fees; (6) error in the calculation of prejudgment interest; (7) error in application of settlement credits; and (8) error in ordering BP America to transfer its overriding royalty interests to the Marshalls.

### BP AMERICA ISSUES ONE AND TWO – FRAUD

In its first and second issues, BP America complains about the portion of the judgment relating to fraud, which the Marshalls alleged was committed affirmatively and by non-disclosure. To establish fraud by affirmative misrepresentation, the Marshalls had to prove BP America (1) made a material misrepresentation (2) it knew was false or recklessly made it without any knowledge of its truth (3) with the intent it should be acted on by the Marshalls, and (4) the Marshalls actually relied and suffered injury. *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). To establish fraud by omission, the Marshalls had to prove BP America (1) concealed or failed to disclose a material fact within its knowledge that it had a duty to disclose (2) knowing the Marshalls were ignorant of the facts and did not have an equal opportunity to discover the truth (3) with the intent to induce the Marshalls to act, and (4) the Marshalls suffered injury as a result of their acting without knowledge of the undisclosed facts. *See 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 507 n.27 (Tex. App.–Houston [14th Dist.] 2007, pets. denied); *see also Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997).

BP America has raised numerous sub-issues within each issue relating to the fraud findings. We address each argument separately.

### *No Legally Cognizable Fraud Injury*

BP America first contends there is no evidence the Marshalls suffered any injury from the alleged fraud. BP America argues that at trial the only injury the Marshalls claimed resulted from the alleged fraud was that it allowed BP America and its successors, EOG and the Wagner defendants, to assert title to the Marshall Lease based on adverse possession. However, according to BP America, the only evidence of damages offered by the Marshalls were the proceeds to which they would have been entitled as an unleased cotenant and this was the only measure of damages submitted to the jury. Further, the Marshalls did not produce any evidence of damages incurred as a result of claims of adverse possession. BP America also contends that because a party cannot acquire limitations title by fraud, any fraud it committed forestalled the running of the statute of limitations and the Marshalls in fact suffered no injury based on claims of adverse possession. We find this argument misconstrues the damages sought and recovered by the Marshalls.

A property owner acquires legal right to compensation when he sustains a legal injury respecting his property. *State v. Schmidt*, 805 S.W.2d 25, 29 (Tex. App.–Austin 1991), *rev'd on other grounds*, 867 S.W.2d 769 (Tex. 1993), *cert. denied*, 512 U.S. 1236 (1994). A legal injury is an injury giving rise to a cause of action because it is an invasion of the plaintiff's legally protected interest. *Am. Med. Elecs., Inc. v. Korn*, 819 S.W.2d 573, 577 n. 3 (Tex. App.–Dallas 1991, writ denied); *Zidell v. Bird,* 692 S.W.2d 550, 555 (Tex. App.–Austin 1985, no writ). During the lease term, the Marshalls, as lessors, were entitled to a royalty interest, but if the lease terminated, they would have been entitled to payment as unleased cotenants. The Marshalls alleged and presented

evidence that as a "direct consequence" of BP America's fraud in concealing the lease termination, they "received a substantial underpayment of what they should have received as unleased cotenants." We agree. Once the lease terminated, the Marshalls became unleased cotenants. *See Wagner & Brown, Ltd. v. Sheppard*, 198 S.W.3d 369, 377 (Tex. App.–Texarkana 2006, *pet. granted on other grounds* Aug. 24, 2007); *Ladd Petroleum Corp. v. Eagle Oil and Gas Co.*, 695 S.W.2d 99, 110-11 (Tex. App.–Fort Worth 1985, writ ref'd n.r.e.). As unleased cotenants the Marshalls were, in the absence of bad faith, entitled to "the value of the minerals taken less the necessary and reasonable cost of producing and marketing the same," rather than the 1/8th royalty from production due under the lease.[3] *See Cox v. Davison*, 397 S.W.2d 200, 201 (Tex. 1965). The Marshalls proved they were underpaid as a result of BP America's fraud and they suffered a legal injury directly traceable to the alleged fraud. As the Marshalls' counsel stated at trial, and contrary to BP America's claim, "the damage theory is the same damage theory that's been in this case throughout. It's a cotenancy damage theory." Accordingly, we overrule this portion of BP America's first and second issues.

### *No Evidence to Support Damages*

BP America makes several arguments within this issue. First, BP America argues there was no evidence of damages because the Marshalls and EOG entered into a pretrial settlement and thus EOG did not obtain any portion of the Marshall Lease due to adverse possession. As discussed above, the Marshalls did not recover damages based on EOG's adverse possession claim or damages based on defending against such a claim. Rather, the Marshalls pled and presented evidence that as a result of BP America's fraud, they "received a substantial underpayment of what they should have

---

[3] *See infra* section entitled "***Future Accounting***."

received as unleased cotenants." This was the exact measure of damages upon which the jury based its findings. Thus, we overrule this portion of the damage issue.

BP America also argues the trial court erred in admitting the Marshalls' only damage evidence – the calculations of damages created and used by expert Charles Graham – because it was not timely disclosed in discovery. According to BP America, Graham created and produced the calculations he offered at trial only a week before trial in violation of Rule 195 of the Texas Rules of Civil Procedure, which requires a party to provide the expert information set forth in Rule 194.2(f) no later than ninety days before the end of the discovery period. *See* TEX. R. CIV. P. 195.2. BP America contends the evidence must be excluded because the Marshalls did not timely provide the information under Rule 194.2(f) and did not establish good cause for the failure to disclose or that BP America was not unfairly prejudiced. *See* TEX. R. CIV. P. 193.6.

We review a trial court's decision to admit or exclude expert evidence based on an alleged failure to timely disclose for an abuse of discretion. *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 52 (Tex. App.–San Antonio 2006, no pet.). "We reverse based on the erroneous admission or exclusion of evidence only if the appellant shows error that was calculated to cause and probably did cause the rendition of an improper judgment." *Id.*

Graham's testimony was based on information provided in the deposition of Rudolph Mikulec, a director of accounting for EOG (originally one of BP America's co-defendants). This deposition was taken a little more than a month before trial and BP America has not raised any complaint about the timing of this deposition. In response to BP America's request to exclude Graham's testimony pursuant to Rule 193.6, counsel for the Marshalls told the trial court that the revenue numbers used by Graham for his calculations could not have been provided any earlier

because those numbers derived from Mikulec's deposition testimony. We hold the information provided by the Marshalls to the trial court in opposition to BP America's attempt to exclude Graham's testimony is sufficient to support a finding of good faith by the trial court. *See* TEX. R. CIV. P. 193.6. While the trial court did not make an explicit finding of good faith, the record before us amply supports an implicit finding. *See Wal-Mart Stores, Inc. v. Tinsley*, 998 S.W.2d 664, 671 (Tex. App.–Texarkana 1999, pet. denied) (holding that while trial court's ruling did not expressly state party offering evidence demonstrated good cause to permit introduction, record supported an implicit finding of good cause).

Additionally, while Graham's actual calculations were not part of Mikulec's previously disclosed testimony or data, they were updates of previously disclosed information, altered due to the passage of time. This court has held that an expert may "modify his testimony based on refinements in his calculations . . . through the time of trial without . . . the need to supplement." *Vela*, 203 S.W.3d at 53. "When an expert simply applies different data of record to a previously disclosed formula to render an alternate opinion than the opposing expert, that qualifies as a mere refinement of his opinion without the need to supplement." *Id.* The provision of the calculations shortly before trial was not a bar to the admission of Graham's testimony. *See id.*

Finally, BP America's no evidence argument fails even if the trial court erred in admitting Graham's testimony. Contrary to BP America's assertion, Graham's testimony was not the only evidence to support the jury's damage findings. Rather, Mikulec's testimony, which is unchallenged by BP America, also supports the damage findings. BP America has not demonstrated reversible error pursuant to Rule 44.1(a) because it has not shown that the damages finding rested solely on Graham's testimony. *See Doncaster v. Hernaiz*, 161 S.W.3d 594, 601 (Tex. App.–San Antonio

2005, no pet.). Based on the foregoing, we overrule BP America's no evidence challenge to the damage findings.

### *Alleged Fraudulent Statement Not Actionable*

BP America next argues the statement the Marshalls rely upon for the fraud by misrepresentation claim is not actionable because it is based on a legal opinion. As noted above, Stanley Marshall called BP America and spoke to Young. In response to Stanley's inquiry, Young declared that BP America "had maintained continuous operations," "the lease was still in effect," and there had been "no cessation [of operations] of more than 60 days."

BP America argues that the statement, "the lease was still in effect," is not actionable because it is purely a legal opinion about the legal status of the Marshall Lease. It is true that "an actionable representation is one concerning a material fact; pure expression of opinion will not support an action for fraud." *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). It is also true that as a general rule, claims of fraud cannot arise from legal opinions.[4] *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex. 1987). However, "the lease was still in effect" was not the only statement made by Young to Stanley Marshall. Young also told Marshall that BP America "had maintained continuous operations" and that there had been "no cessation [of operations] of more than 60 days." Both of these statements are factual representations, not mere legal opinions about the lease, and BP America does not dispute that these statements were made or their factual nature. Therefore, even if we were to hold that the statement regarding the viability of the lease was not actionable, Young made other statements that were actionable and upon which the jury could have

---

[4] There are exceptions to the general rule. *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex. 1987). Statements that might ordinarily be classified as non-actionable legal opinions are actionable where: (1) a party with superior knowledge takes advantage of another's ignorance of the law to deceive him by studied concealment or misrepresentation, (2) there is a fiduciary relationship between the parties, and (3) misrepresentations involving a point of law are intended to be misrepresentations of fact and are understood as such. *Id.*

based its finding of fraud. Additionally, it could be argued that the statement "the lease was still in effect" was a misrepresentation of fact because Young, a landman, not a lawyer, intended it that way and it was understood as a statement of fact by Stanley. *See Fina Supply*, 726 S.W.2d at 540 (recognizing that despite general rule misrepresentations involving legal points are to be considered factual misrepresentations if they were so intended and understood). We overrule BP America's complaint and hold it did make actionable statements of fact that were subject to a fraud claim.

### *Fraud by Misrepresentation Limited to Stanley Marshall*

BP America next claims that even if the alleged misrepresentations could form the basis of a fraud claim, the statements were made only to Stanley Marshall and any fraud claim based upon those misrepresentations is limited to Stanley Marshall because: (1) there was no evidence Stanley Marshall told Young he was calling or otherwise acting on behalf of his siblings; (2) "there were no pleadings nor discovery responses that Stanley Marshall was acting in any capacity other than as an individual at the time the conversation took place," and (3) there is no evidence the other Marshall siblings learned about the representation or acted in reliance on it.

In support of its contentions, BP America relies upon the general rule that a person making a representation is only accountable for its truth to the person he seeks to influence and no one else has a right to rely on the representation or make a claim based upon its alleged falsity. *See Westcliff Co. v. Wall*, 153 Tex. 271, 267 S.W.2d 544, 546 (1954). And, according to BP America, even when third parties are entitled to assert claims based on representations to others, such third parties must show they learned of the misrepresentation and acted in reliance on it. *See Marshall v. Kusch*, 84 S.W.3d 781, 785 (Tex. App.–Dallas 2002, pet. denied).

BP America is correct insofar as the general rules are concerned.  However, the arguments and cases relied upon by BP America are distinguishable.  In *Westcliff*, an officer of Westcliff, a corporate landowner, made representations about certain property to a prospective buyer, Clifton. 267 S.W.2d at 545.  The representations were made in the presence of Wall, who subsequently purchased property across the street. *Id*. at 545-46.  When the representations made to Clifton were not implemented, Wall sued Westcliff for fraud based on the alleged misrepresentation made to Clifton. *Id*.  The supreme court held Wall could not rely on the representation. *Id*.  *Westcliff* was clearly a situation where a representation was made to one party, but was overheard and relied upon by a stranger to the transaction.

Here, we have a group of siblings where one sibling was given authority to act on behalf of the others.  The jury found that Robert Marshall, Catherine Marshall, and Margaret Marshall gave Stanley Marshall "the authority to act as the family representative, manage their affairs, and make the decisions on their behalf with respect to the Marshall Lease."  BP America admits that its only objection to this jury question was a lack of pleadings to support the question.  The Marshalls, however, obtained leave to file a post-trial amendment and that amendment stated:  "[t]he Marshall Family pleads that the other members of the Marshall Family, namely Robert Marshall, Catherine Marshall, and Margaret Marshall gave Stanley Marshall the authority to act as their agent and as the family representative, manage their affairs, and make the decisions on their behalf with respect to the Marshall Lease."  BP America does not argue on appeal that the trial court erred in submitting the question, allowing the amendment, instructing the jury that a fraudulent misrepresentation may be direct or indirect, or that the evidence is insufficient to support the jury's finding.  Given the jury's finding that Stanley Marshall had authority to act on behalf of his siblings, which is

unchallenged by BP America, we hold Young's representations to Stanley Marshall were effectively representations to Robert Marshall, Catherine Marshall, and Margaret Marshall. *See Colonial Refrigerated Transp., Inc. v. Mitchell*, 403 F.2d 541, 549-50 (5th Cir. 1968) (holding that joint venture relationship amongst plaintiffs was such that communication of misrepresentation to one constituted communication to all); *Roberts v. Salot*, 166 Cal.App.2d 294, 300, 333 P.2d 232, 236 (1958) (holding that although only daughter had direct dealings with defendant, because she was acting as father's agent, father had right of action for fraud). We therefore overrule this portion of BP America's first issue and hold the fraud claim based on Young's misrepresentations is not limited to Stanley Marshall.

### *Fraud by Non-Disclosure Not Actionable – No Duty to Disclose*

In addition to claiming fraud by affirmative misrepresentation, the Marshalls claimed fraud by non-disclosure. BP America contends it had no duty to disclose because there was no confidential or fiduciary relationship between BP America and the Marshalls. The Marshalls argue that by making partial disclosures that conveyed a false impression regarding activities on the Marshall lease, BP America assumed a duty to fully disclose the entire truth and that by not doing so, it misled the Marshalls.

For there to be actionable fraud based upon a non-disclosure, there must be a duty to disclose. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Whether a duty exists is a question of law. *Id*. BP America relies on cases holding that in a commercial transaction there is no duty to disclose in the absence of a confidential or fiduciary relationship and that the relationship between a lessor and lessee is neither. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (holding no duty arises in commercial transaction in absence of confidential or fiduciary relationship); *HECI*

*Exploration Co. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998) (holding relationship between lessor and lessee is neither fiduciary nor confidential and there is no duty to disclose). BP America also notes the supreme court has acknowledged that certain Texas appellate courts have held a duty to disclose may arise in an arm's length business transaction when one party makes a partial disclosure that although true, conveys a false impression. However, the supreme court expressly stated it had not adopted section 551 of the Second Restatement of Torts, which recognizes a general duty to disclose facts in a commercial setting. *Bradford*, 48 S.W.3d at 755-56; *see* RESTATEMENT (SECOND) OF TORTS § 551 (1977). BP America argues the supreme court in *Bradford* wholly rejected the concept of duty to disclose in an arm's length business transaction. *See id.* We disagree with BP America's construction of *Bradford*. *See Smith v. BCE Inc.*, No. CIV.A.SA-04-CA0303XR, 2005 WL 3454104, at *9-*10 (W.D. Tex. Nov. 29, 2005) (holding *Bradford* did not foreclose existence of duty to disclose outside context of confidential or fiduciary relationship). In *Bradford*, the supreme court held that even if it recognized such a general duty to disclose in commercial transactions, there was no evidence in that case to establish the defendant knew the plaintiff was ignorant of certain lease terms or did not have an equal opportunity to discover such terms. *Id*. at 756. *Bradford* does not hold, as BP America suggests, there is a duty to disclose only if a confidential or fiduciary relationship exists. *See id.* Moreover, the supreme court did not overrule those cases from the courts of appeal applying section 551. *See id.*

In *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212 (Tex. App.–Houston [14th Dist.] 2001, pet denied), the Fourteenth Court of Appeals, citing numerous other courts of appeals' decisions, held the existence of a confidential or fiduciary relationship is "but one of the bases for imposing a duty to disclose information." The court concluded there are at least three other

situations in which a duty to speak may arise: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when he knows the new information makes the earlier representation misleading or false; and (3) when one makes a partial disclosure and conveys a false impression, he has a duty to speak. *Id*. at 212-13; *accord Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 477 (Tex. App.–Fort Worth 2004, no pet.); *Lesikar v. Rappeport*, 33 S.W.3d 282, 299 (Tex. App.–Texarkana 2000, pet. denied).

Here, it is undisputed that Young made voluntary representations to Stanley Marshall, both orally and in writing, about the status of the lease and BP America's activities relating to it. By voluntarily making such representations, BP America, acting through Young, assumed a duty to disclose the entire truth. *See Anderson*, 44 S.W.3d at 212; *Lesikar*, 33 S.W.3d at 299. We hold BP America did assume a duty to disclose the whole truth when its agent voluntarily made representations concerning the Marshall Lease to Stanley Marshall. This portion of BP America's first issue is overruled.

### *No Evidence BP America Failed to Disclose Material Fact*

BP America next contends there is no evidence it failed to disclose any material facts relating to the activities on the J. O. Walker No. 1. BP America argues the omissions relied upon by the Marshalls to support their fraud claim "are a grab bag of irrelevancies and half truths" and none of them are material facts of which the Marshalls were ignorant with no opportunity to discover the truth. BP America points out that the letter from Young did not purport to contain a detailed description of all operations on the well. Rather, it was simply a summary and Stanley Marshall could have requested more detailed information. BP America also argues the Marshalls could have

discovered there was no potential in the Upper Wilcox by reviewing the well log for the J.O. Walker No. 1 well, which was located in the records of the Texas Railroad Commission.

The Marshalls counter that once BP America voluntarily disclosed information, it had a duty to fully disclose. Young's letter, which contained nothing more than a list of activities at the well site, was designed to create the false impression of continuous operations, failed to disclose information that would have prompted further investigation. The Marshalls contend this was fraud by omission.

*Standard of Review*

In reviewing a challenge to the legal sufficiency of the evidence, the appellate court "must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). If the evidence allows only one inference, neither the jury nor the reviewing court may disregard it. *Id.* at 822. The final test for legal sufficiency must always be whether the evidence would enable fair-minded people to reach the verdict under review. *Id.* at 827.

*The Evidence*

In his letter to Stanley Marshall, Young summarized BP America's activities on the J.O. Walker No. 1 well, including activity relating to the Upper Wilcox, and then concluded with information about the new well being drilled pursuant to the Sanchez-O'Brien farmout agreement. The evidence showed this letter was intended to persuade the Marshalls that BP America had engaged in continuous operations toward production in commercial quantities with regard to the Marshall Lease. However, evidence produced by the Marshalls established that BP America,

through Young, omitted information from the letter that would have corrected the false impression, and, at a minimum, prompted Stanley Marshall to investigate whether BP America's actions were directed toward obtaining production in commercial quantities. The letter also contained misleading and incomplete descriptions of BP America's activities on the Marshall Lease when complete and accurate descriptions of the activities might have alerted Stanley Marshall to the true nature of BP America's activities. As Stanley Marshall testified, Young's letter was a "sin of omission" creating the impression of operations to produce in commercial quantities "after it was apparent they [sic] was no hope of salvation for that well."

With regard to alleged omissions, Stanley Marshall testified Young's letter contained only certain information about activities on the well. The letter omitted other information, specifically information concerning the results of activities undertaken at the well, information included in BP America's drilling reports, but noticeably absent from Young's letter to Stanley Marshall. Stanley Marshall testified Young's letter should have included all of the information from its internal drilling reports, which provided details about the effects of the alleged activities on the well. Stanley Marshall testified that if BP America had disclosed an absence of good faith operations in Young's letter by providing a complete picture, the Marshalls would have "taken all the steps necessary to get that land back." Much of Stanley Marshall's testimony implied that if he had been given a complete picture of the alleged activities on the well he would have, at a minimum, requested additional information or conducted his own investigation into the status of the lease.

Charles Graham testified as an expert witness about omissions in the Young letter. He stated that while the letter stated the rig was released in September of 1980, it failed to mention the primary objective of the well had not yielded production. He said this information was known and should

have been included in the Young chronology given Stanley Marshall's request for information on the status of the well. He said this was "a very, very important fact, that the reason they drilled the well was gone," implying this would have put the Marshalls on notice that further investigation into the status of the lease was required. According to Graham, BP America advised in the letter to Stanley Marshall that it had perforated the Middle Wilcox, but failed to include the fact that the Middle Wilcox was "a secondary objective at best." Graham considered this a "very significant omission." BP America also omitted the fact that after perforating the Middle Wilcox the well started "making water and small heads of gas," which was important given that Young's letter stated the well "flowed in gel water for four hours." Including only the latter information gave the impression the well was only producing water that had been pumped in, not that it was actually producing its own water. Another representation that failed to give a full picture of what was going on at the J.O. Walker No. 1 was the declaration in the letter that on December 4th BP America "flowed frac water to pit for two hours." Graham testified the letter should have said that when BP America opened the valve "it blew down to zero in one minute" and a two inch stream of water is what flowed for two hours.

Graham averred Young's letter should have included an admission that BP America had given up on the well, but instead included an entry that on January 7, 1981, that BP America "bled water to pit for two and a half hours and shut in," which should not have been on the chronology because it was not an activity that qualified under good faith operations. This testimony implies the letter was designed to mislead the Marshalls into believing BP America was still conducting operations in good faith. Graham testified there were other entries in the letter designed, by

omission, to give the same impression when in fact BP America was simply using shallow drilling and other means to hold onto the lease.

Graham opined that if BP America had provided sufficient detail in Young's letter, "then there would have been a way for someone like myself to verify the representations made." But, as written, there was nothing to lead the Marshalls to believe that good faith operations were not continuing or that further investigation was warranted.

The evidence produced by the Marshalls showed that many of the activities described in the letter were done merely to give the impression that work was continuing, which failed to alert Stanley Marshall to the true status of the lease. Expert Larry V. Macicek testified he worked for ARCO from 1971 through 1994 and was employed by ARCO at the time it drilled the J. O. Walker No. 1 well. He was the first level supervisor of engineering for the area and was one of two or three engineers working as part of a team. He testified that based upon his review of BP America's activities and documents relating to the J.O. Walker No. 1, any reasonably prudent operator would have known after December 4, 1980, the well was never going to produce in paying quantities. He also testified the testing on the Upper Wilcox, the activity used by BP America to claim the leases were still viable, "did not constitute meaningful work toward trying to establish production." Despite the fact that BP America should have known after December 4, 1980, that the well was not going to produce in paying quantities, Young never indicated this in his letter. Rather, he provided a list of "activities" conducted by BP America on the well, which the jury could have inferred was meant to cover the fact that BP America knew, but decided to conceal, that the J.O. Walker No. 1 was never going to produce in commercial quantities.

There is some evidence that BP America omitted material facts and provided incomplete descriptions. The evidence shows that if all the relevant information had been fully and accurately disclosed, the Marshalls would have been prompted to further investigate whether BP America had engaged in good faith efforts to produce oil or gas in paying quantities or whether there had been any cessation of operations for sixty days. The evidence, when considered in the proper light, is legally sufficient to establish fraud by non-disclosure and we overrule this portion of BP America's issue. *See City of Keller*, 168 S.W.3d at 807.

### *No Evidence of Reliance by Catherine Marshall or Margaret Marshall*

BP America next argues that even if Stanley Marshall was the family representative and this relationship was sufficient to extend the misrepresentations made to him to his brother and sisters, the Marshall sisters are still not entitled to recover for fraud because there was no evidence of reliance by either Catherine Marshall or Margaret Marshall. According to BP America, to recover for fraud there must be individualized proof of reliance.

In support of its argument, BP America relies on cases in which there was no jury finding that an agent was specifically authorized to make decisions on behalf of those seeking to recover for fraud. Rather, the cases relied upon by BP America involve class certifications or situations where the representation was made to one who was not acting on behalf of the plaintiff bringing the fraud claim. *See Ernst & Young L.L.P. V. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001) (holding accounting firm negated reliance on audit as a matter of law in suit by investor against accounting firm that performed audit for bank for purposes of earlier merger); *Marshall*, 84 S.W.3d at 785 (holding representation of no anthrax on game property made by defendant to real estate broker, who conveyed representation to another real estate broker, was insufficient to allow

subsequent purchaser to maintain action for fraud); *Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. App.–Tyler 2000, pet. denied) (holding trial court erred in certifying class action because individualized proof of materiality of misrepresentation and reliance required for car buyers suing car dealership and bank concerning car purchase financing); *Spera v. Fleming, Hovenkamp & Grayson, P.C.*, 4 S.W.3d 805, 811 (Tex. App.–Houston [14th Dist.] 1999, no pet.) (holding trial court did not err in denying class certification in suit by numerous former clients against attorneys because fraud claim involved individual issues including reliance). BP America has cited no cases holding that individual reliance is required when there is a jury finding on agency.

We hold BP America's contention that there was no evidence of reliance by Catherine Marshall or Margaret Marshall with regard to either fraud allegation is without merit. As the family agent, Stanley was authorized not only to receive information on behalf of his siblings, but to act on their behalf. As the family agent, he would be necessarily acting and relying on information he received with regard to the lease on behalf of each family member. So, just as representations to Stanley Marshall were representations to each of the Marshalls, Stanley Marshall's reliance on those representations was reliance by each of the Marshalls including Catherine and Margaret Marshall. *See Mitchell*, 403 F.2d at 549-50; *Roberts*, 333 P.2d at 236.

### *No Reliable Evidence BP America's Efforts on the Upper Wilcox Were Not in Good Faith*

BP America argues the evidence is legally insufficient to establish it was not acting in good faith in testing the Upper Wilcox because the testimony of the Marshalls' expert, Charles Graham, "does not constitute reliable evidence that [BP America] was not acting in good faith when it decided in 1980 to test the Upper Wilcox." BP America argues Graham's testimony is unreliable because "there is a huge gap between the underlying data and the opinion offered."

We need not decide whether Graham's testimony is unreliable because other evidence sufficiently supports the jury's finding. Macicek testified that based on his review of the documentation relating to the well, in 1980 and 1981 BP America acted as an "unreasonable and imprudent operator." When asked about the testing of the Upper Wilcox, he stated that the "chance of being a productive event was so remote that it was not a warranted test." Macicek said the decision to test the Upper Wilcox was not made for economic reasons relating to producing in that zone of the well because it had "essentially no chance of economic benefit." Rather, Macicek opined the economic or management considerations in testing the Upper Wilcox had to do with issues other than production. He testified he could not "see how this zone test would have met the qualifications for a good prospective event" and that in his opinion "the Upper Wilcox test was a test not in good faith." Macicek stated that in his opinion BP America did not conduct operations on the J.O. Walker No. 1 for a period of more than sixty consecutive days. He testified the lack of operations in good faith began December 4, 1980, and there was no resumption of good faith operations for sixty days. He said the operations conducted during this time period were not "meaningful work toward trying to establish production."

This testimony, which is not challenged by BP America, is sufficient to support the jury's finding that the Marshall Lease terminated because BP America's operations on J.O. Walker No. 1 were not conducted in a good faith effort to obtain production in paying quantities. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 40 (Tex. 2007) (holding that when one expert's testimony is sufficiently reliable, court need not assess reliability of other expert's testimony). We therefore overrule this issue.

### BP AMERICA ISSUE THREE – LIMITATIONS

In its third issue BP America contends the Marshalls' lease termination and fraud claims are barred by limitations and the trial court erred in refusing to so find.

### *Lease Termination Claim*

BP America argues the lease termination claim is barred by limitations because the Marshalls claim the lease terminated in 1980 but did not bring suit until 2001. BP America claims the Marshalls' lease termination claim is an implied covenant claim and the applicable limitations period is four years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon 2002). The Marshalls assert this argument is waived and, represents a fundamental misunderstanding of the property interest owned by the Marshalls, the interest acquired by BP America as lessee, and the legal effect of the continuous operations clause in the Marshall Lease.[5] According to the Marshalls, the nature of an oil and gas lease interest precludes application of the four-year statute of limitations in section 16.004. We agree with the Marshalls.

An oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real property. *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). Rather, in a typical oil and gas lease, "the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Id.* The lessee acquires ownership of all the minerals in place

---

[5] The Marshalls argue BP America has waived all arguments with regard to limitations and the lease termination claim because until appeal BP America never argued the Marshalls' lease termination claim was an implied covenant claim barred by the four-years statute of limitations in section 16.004; rather, BP America argued the Marshalls' lease termination claim was a declaratory judgment action. BP America never characterized the Marshalls' lease termination claim as an implied covenant claim in the trial court and so any appellate argument based the contention that the Marshalls asserted an implied covenant claim was not preserved for appellate review. *See Weinberger v. Longer*, 222 S.W.3d 557, 567 (Tex. App.–Houston [14th Dist.] 2007, pet. denied) (holding that objection in trial court that is not same as issue urged on appeal preserves nothing for appellate review). However, BP America did consistently argue that the Marshalls' lease termination claim was barred by the four-year statute of limitations, so we will review the issue in this light.

that the lessor owned and purported to lease, subject to the possibility of reverter in the lessor. *Id.* The lessee's interest is "determinable" because it may terminate and revert to the lessor upon occurrence of certain events specified in the lease that terminate the lease. *Id.* Typically, a lease is kept alive after its primary term only by production in paying quantities or a savings clause such as a shut-in royalty clause, a continuous operations clause, or a drilling operations clause. *Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 315 (Tex. App.–Amarillo 2001, pet. denied). If the lease's primary term expires when there is non-production and the lessee fails to comply with any savings clause in the lease, the lease and the lessee's determinable fee interest "automatically terminates." *Id.* The lease terminates and the fee interest reverts to the lessor without the lessor taking any legal action. *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 30 (1929); *Kincaid v. Gulf Oil Corp.*, 675 S.W.2d 250, 255 (Tex. App.–San Antonio 1984, writ ref'd n.r.e.). Once a lease terminates by its own terms, it cannot be ratified or revived by subsequent actions of the lessor. *Ladd Petroleum*, 695 S.W.2d at 109; *Woodson Oil Co. v. Pruett*, 281 S.W.2d 159, 165 (Tex. Civ. App.–San Antonio 1955, writ ref'd n.r.e.).

In this case, BP America relied on the continuous operations savings clause in an attempt to keep the Marshall Lease alive past its primary term. The jury found BP America failed to conduct operations on J.O. Walker No. 1 well for more than sixty consecutive days between December 4, 1980, and April 13, 1981, and there is sufficient evidence to support this finding. Therefore, the Marshall Lease automatically terminated. *See Krabbe*, 46 S.W.3d at 315. BP America argues it was entitled to maintain the lease because the Marshalls failed to bring suit on the lease termination claim within four years of the alleged 1980 termination date. This contention is without merit. The Marshalls were not required to take legal action; the lease terminated by its own terms. Accordingly,

the four-year statute of limitations in section 16.004 does not apply.[6] We overrule this portion of issue three.

### *Fraud*

BP America also argues the Marshalls' fraud claim is barred by the four-year statute of limitations in section 16.004. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon 2002). More specifically, BP America claims the alleged misrepresentations and omissions were made in 1981, but the Marshalls did not bring suit until 2001. BP America contends that neither the discovery rule nor fraudulent concealment applies.

With regard to the discovery rule, BP America does not challenge the jury's finding that the Marshalls did not have sufficient knowledge that would have required a reasonable person to make an inquiry that would have led to the discovery of the fraud until June 29, 2000. Rather, BP America argues the discovery rule does not apply to the fraud claim because the nature of the Marshalls' injury was neither inherently undiscoverable nor objectively unverifiable. We disagree.

"The discovery rule defers accrual of certain causes of action until the plaintiff knew, or exercising reasonable diligence, should have known of the wrongful act causing injury. *Salinas v. Gary Pools, Inc.*, 31 S.W.3d 333, 336 (Tex. App.–San Antonio 2000, no pet.). The discovery rule applies only to a limited category of cases, including cases involving fraud or fraudulent

---

[6] As the Marshalls point out, BP America does not cite and there are no reported decisions applying the four-year statute of limitations in section 16.004 to an oil and gas lease dispute involving an automatic termination. There are, however, many reported cases involving controversies about whether a lease was extended beyond its primary term due to actions or inactions of the operator that were brought decades after the alleged actions or inactions of the operators giving rise to the suit and no operator ever attempted to alleged a four-year limitations defense. *See, e.g., Krabbe*, 46 S.W.3d at 311-13 (lessor brought suit to declare lease terminated fourteen years after temporary cessation of production); *Utley v. Marathon Oil Co.*, 31 S.W.3d 274, 275-79 (Tex. App.–Waco 2000, no pet.) (involving application of continuous operations clause to activities occurring roughly twenty years before suit); *Grimes v. Dorchester Gas Prod. Co.*, 707 S.W.2d 196, 199 (Tex. App.–Amarillo 1986, writ ref'd n.r.e.) (involving landowner seeking declaration that lease terminated more than forty years before suit filed).

concealment. *Id*. (citing *Murphy v. Campbell,* 964 S.W.2d 265, 270 (Tex. 1997)). Accordingly, BP America's argument based on whether the nature of the injury is inherently discoverable and the injury itself is objectively verifiable is inapplicable. Because BP America does not challenge the jury's finding relating to the date of discovery, which is within the applicable limitations period, we overrule this portion of issue three. We need not address BP America's claim that the Marshalls did not prove fraudulent concealment because the application of the discovery rule alone is sufficient to defeat BP America limitations defense.

## BP AMERICA ISSUE FOUR – ATTORNEYS' FEES

The trial court awarded the Marshalls "$759,559.35 in attorneys's fees under Chapters 37 and 38 of the Texas Civil Practice and Remedies Code." In its fourth issue, BP America challenges the trial court's award of attorneys' fees claiming the trial court erred in awarding attorneys' fees under both Chapters 37 and 38 of the Texas Civil Practice and Remedies Code.

### *Section 37.009 of the Texas Civil Practice and Remedies Code*

Chapter 37 of the Texas Civil Practice and Remedies Code contains the Texas Uniform Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(a) (Vernon Supp. 2007). Section 37.009 provides that in any proceeding under the Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id*. § 37.009. BP America argues the trial court erred in awarding fees under the Act because the Marshalls' suit involved determination of title to the Marshall Lease and title disputes are governed by Chapter 22 of the Texas Property Code, which does not provide for recovery of attorney's fees. *See EOG Resources v. Killam Oil Co.*, 239 S.W.3d 293, 304 (Tex. App.–San Antonio 2007, pet. denied) (holding recovery of attorney's fees is barred in a trespass to try title action because it is not provided for in

Texas Property Code); *McRae Exploration & Prod., Inc. v. Reserve Petroleum Co.*, 962 S.W.2d 676, 684 (Tex. App.–Waco 1998, no pet.) (holding title disputes are governed by Chapter 22 of the Texas Property Code).

In their Third Amended Plea in Intervention, the Marshalls sought a declaration that (1) the Marshall Lease terminated, (2) BP America did not conduct operations or activities on the Marshall Lease without cessation for sixty consecutive days, (3) the Marshall Lease expired on its own terms because J.O. Walker No. 1 did not result in production or, in the alternative, that BP America's actions did not constitute a good faith effort to obtain production, and (4) the Marshalls are entitled to an accounting of their respective share of production in the event the court declared the Marshall Lease terminated. They also brought an action to quiet title based on the alleged termination.

A trespass to try title suit is "the method of determining title to lands, tenements, and other real property." TEX. PROP. CODE ANN. § 22.001(a) (Vernon 2000). The Texas Declaratory Judgments Act provides that "[a] person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the instrument [or] contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (Vernon 1997). When the suit does not involve the construction or validity of deeds or other documents of title, the suit is not one for declaratory judgment. *McRae Exploration*, 962 S.W.2d at 685.

The construction of the Marshall Lease was not at issue in this case. By its terms, the lease was to continue so long as BP America was engaged in drilling or reworking operations with no cessation of more than sixty days. The issues were whether BP America failed to engage in good

faith drilling or reworking operations without a sixty-day cessation and committed fraud with regard to its activities. Despite their pleading, the underlying nature of the Marshalls' suit was to obtain a determination of title to the leasehold and for further relief based on that determination, *e.g.*, an accounting. Consequently, BP America is correct, the Marshalls were not entitled to recovery attorney's fees under section 37.009 of the Act. *See EOG Resources*, 239 S.W.3d at 304.

### *Section 38.002 of the Texas Civil Practice and Remedies Code*

The Marshalls contend the trial court correctly awarded them attorney's fees under section 38.001(8) of the Civil Practice and Remedies Code, which provides that a party who prevails on a breach of contract claim may recover his reasonable attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 1997). BP America argues the award was erroneous and we agree.

The Marshalls did not assert a breach of contract claim, the jury was not charged on breach of contract, and the Marshalls did not recover for breach of contract. The Marshalls' claims included a declaratory judgment action seeking a declaration the lease terminated, a suit to quiet title, and fraud/bad faith. Neither the lease termination claim nor the other claims constitute a breach of contract claim so as to support an award of attorney's fees. *See W.T. Waggoner Estate*, 19 S.W.2d at 30 (holding that when lease terminates, fee interest reverts to lessor without lessor taking any legal action); *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (recognizing distinction between tort claims and breach of contract claims); *Sw. Guar. Trust Co. v. Hardy Road 13.4 Joint Venture*, 981 S.W.2d 951, 957 (Tex. App.–Houston [1st Dist.] 1998, pet. denied) (holding attorney's fees are not recoverable in suit to quite title). Accordingly, because the Marshalls did not assert a claim for breach of contract nor recover based on a contract claim, the trial court erred in awarding them attorney's fees under section 38.001(8).

We hold the trial court erred in awarding the Marshall's attorney's fees and sustain BP America's fourth issue.

## BP AMERICA ISSUE FIVE – OTHER ISSUES

BP America asserts in its final issue that the trial court (1) ignored controlling law with regard to the future accounting ordered in the judgment, (2) miscalculated the award of prejudgment interest, (3) misapplied the settlement credit, and (4) erred in requiring BP America to transfer its overriding royalty interests to the Marshalls.

### *Future Accounting*

BP America argues the trial court ignored controlling Texas law on accounting to cotenants by ordering BP America to provide the Marshalls with a future accounting on a cost-free basis.[7] The Marshalls disagree, arguing BP America is not entitled to a future accounting on a cost-free basis because BP America was a "bad faith trespasser" with respect to its continued receipt of revenue derived from the Marshall Lease.

As unleased cotenants, the Marshalls were entitled to "the value of the minerals taken less the necessary and reasonable cost of producing and marketing the same," rather than the 1/8th royalty from production due under the lease. *See Cox*, 397 S.W.2d at 201. However, a lessee who is a bad faith trespasser is liable to the injured party for "'the value of the things mined . . . without making deduction for the cost of labor and other expenses incurred in committing the wrongful act . . . or for any value he may have added to the mineral by his labor.'" *Mayfield v. de Benavides*, 693 S.W.2d

---

[7] In its first two issues, BP America argued there was no evidence of injury from fraud because the only injury they claimed resulted from the fraud was that it allowed BP America and its successors, EOG and the Wagner entities, to assert title based on adverse possession. With regard to the future accounting, BP America again argues that because there was no fraud injury with respect to the portions of the lease held by EOG and Wagner, there should have been no future accounting with regard to these portions of the lease. Because we have overruled BP America's arguments on the "fraud injury" issue, this contention relating to future accounting is likewise without merit.

500, 504-06 (Tex. App.–San Antonio 1985, writ ref'd n.r.e.) (quoting *Cage Bros. v. Whiteman,* 139 Tex. 522, 163 S.W.2d 638, 642 (1942)).  A bad faith trespasser in these circumstances is a lessee who continues to enter a lease in the absence of a good faith belief in the existence of the lease.  *See Id.* at 504-06.  The Marshalls contend the trial court's decision to award a future accounting on a cost-free basis was within its discretion because BP America was a bad faith trespasser.  *See Sw. Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.–San Antonio 1994, writ denied) (holding that whether to grant equitable remedy of accounting is within trial court's discretion).  We disagree.

In *Mayfield*, this court held the unleased cotenant was entitled to recover on a cost-free basis under facts showing there was actual, continuing entry onto the property in bad faith.  *See Mayfield*, 693 S.W.2d at 504-506.  There was not simply a continued receipt of lease revenue following the lease termination as in this case.  We have been cited no authority countenancing recovery on a cost-free basis in the absence of an actual physical trespass after lease termination. Here, once BP America entered the farm-out agreement with Sanchez-O'Brien, it never entered the Marshall Lease nor will it be entering the lease in the future.  In the absence of an actual physical trespass, as opposed to a "trespass" based on receipt of revenue, we decline to hold an unleased cotenant can recover a future accounting without a reduction for costs.  Accordingly, we sustain this portion of BP America's fifth issue.

### *Prejudgment Interest*

BP America next contends the trial court awarded excessive prejudgment interest because it calculated the interest from the date the Marshalls filed their original plea in intervention. Prejudgment interest is "compensation allowed by law as additional damages for lost use of the

money due as damages during the lapse of time between the accrual of the claim and the date of the judgment. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985). Interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date the suit is filed. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998).

Here, the trial court followed *Kenneco Energy* and awarded prejudgment interest "beginning with the date of filing of the Marshall Family's Plea in Intervention through the day immediately preceding the date of this Judgment." This was correct under *Kenneco Energy*. We overrule this portion of issue five.

### *Settlement Credit*

BP America argues that if we do not eliminate all past damages and the future accounting relating to the EOG acreage, we should reform the judgment to apply the proper settlement credit. BP America argues that because the only damages sought by the Marshalls for their lease termination and fraud claims was what they were entitled to as unleased cotenants, there was but a single injury with the same damages and therefore the one satisfaction rule applies. Because the Marshalls settled their lease termination claim with EOG and received cash and payments on future production, BP America argues it was entitled to a settlement credit equal to the amounts received by the Marshalls from EOG. More specifically, BP America claims the trial court should have applied a credit of $300,000 representing the cash consideration received by the Marshalls from EOG for past damages and a credit against the future accounting obligation equal to the twenty-five percent royalty/overriding royalty the Marshalls will receive from EOG on future production.

The Marshalls contend BP America's approach to the one satisfaction rule is wrong based on current Texas law. We agree. The one satisfaction rule prohibits a plaintiff from recovery twice for the same injury. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex. 2000). The rule applies when multiple defendants commit the same act or when multiple defendants commit different acts that result in a single injury. *Id*. However, a nonsettling defendant may only claim a settlement credit under the one satisfaction rule "based on damages for which all tortfeasors are jointly liable." *Id*. A nonsettling defendant may only successfully urge the one satisfaction rule when there are **joint** tortfeasors. *Id*. Joint tortfeasors are those whose tortious conduct combines as a legal cause of a single and indivisible harm to the plaintiff. *Gilcrease v. Garlock, Inc*., 211 S.W.3d 448, 557 (Tex. App.–El Paso 2006, no pet.) (citing *Riley v. Indus. Fin. Serv. Co.*, 157 Tex. 306, 302 S.W.2d 652, 655 (1957), *overruled on other grounds*, *McMillen v. Klingensmith*, 467 S.W.2d 193, 197 (Tex. 1971); *Landers v. East Tex. Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (Tex. 1952)).

BP America does not claim it is jointly liable with EOG, the settling defendant, for the Marshalls' damages, which were awarded for BP America's fraudulent conduct. And, if it did, such contention would be erroneous. There is nothing in the record to establish that EOG participated in BP America's fraudulent scheme to perpetuate the Marshall Lease. Accordingly, there can be no settlement credit with regard to damages awarded for fraud. *See Casteel*, 22 S.W.3d at 391; *Robertson v. ADJ P'ship, Ltd.*, 204 S.W.3d 484, 495 (Tex. App.–Beaumont 2006, pet. denied) (holding one satisfaction rule inapplicable because nothing in record indicated joint liability for awarded damages). We overrule this portion of issue five.

### *Transfer of Overriding Royalty Interest*

In a two-sentence paragraph, BP America contends the trial court erred in ordering BP America to transfer its overriding royalty interests in the EOG wells to the Marshalls because there was no pleading or legal basis to support such relief. BP America provides no argument, no citation to authority, and no record citations in support of this contention. Rule 38.1(h) requires that a brief contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P 38.1(h). This point of error is overruled for lack of adequate briefing. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284-85 (Tex. 1994) (holding appellate court has discretion to deem appellate points waived due to inadequate briefing).

## CONCLUSION TO BP AMERICA/MARSHALL APPEAL

We sustain the portion of BP America's fifth issue complaining of the award to the Marshalls of a future accounting on a cost-free basis and the award of attorney's fees to the Marshalls. We overrule BP America's other issues. Accordingly, we reverse the trial court's judgment as to the award of a future accounting on a cost-free basis and the award of attorney's fees to the Marshalls and affirm the remainder of the trial court's judgment as to the Marshalls' claims against BP America.

## VAQUILLAS/WAGNER APPEAL

### INTRODUCTION

In this portion of the appeal, Vaquillas Ranch Co., Ltd., Vaquillas Unproven Minerals, Ltd., and Vaquillas Proven Minerals, Ltd. ("Vaquillas") complain of the portion of the judgment in favor

of Wagner Oil Company f/k/a Duer Wagner & Co., Jacque Oil & Gas Limited, Duer Wagner Jr., Duer Wagner III, Bryan C. Wagner, James D. Finley, Dennis D. Corkran, David J. Andrews, H.E. Patterson, Brent Talbot, Scott Briggs, and Gysle R. Shellum ("Wagner"). Vaquillas had sought a declaration that the oil and gas lease it granted to BP America had terminated. Wagner, a successor in interest to BP America, claimed that if the lease had terminated, it reacquired the lease by adverse possession. The trial court entered judgment in favor of Wagner. Vaquillas perfected this appeal. We reverse the trial court's judgment in favor of Wagner and remand this portion of the appeal for further proceedings consistent with our opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are the same as those stated in our review of the BP America/Marshall appeal. Therefore, we will relate additional facts only as necessary to our discussion of the issues.

The Vaquillas entities are family businesses associated with Evan B. Quiros and his family. Vaquillas owns the entire surface of the Slator Ranch, but only a portion of the minerals. Vaquillas entered into an oil and gas lease with BP America ("the Vaquillas Lease"). The terms of the lease were essentially the same as those in the Marshall Lease: a five-year primary period with a savings clause that continued the lease as long as drilling or reworking operations did not cease for more than sixty days. Pursuant to the lease, BP America drilled the J.O. Walker No. 1. Due to problems with the well, which were discussed earlier in this opinion, BP America finalized a farmout agreement with Sanchez-O'Brien Oil and Gas Company ("Sanchez-O'Brien") on March 25, 1981. On April 13, 1981, Sanchez-O'Brien commenced operations on the Vaquillas Ranch Ltd. No. 1 well, which eventually produced gas in paying quantities.

Meanwhile, Evan Quiros and his brother-in-law, Gene Walker, had become concerned about the lack of activity on the J.O. Walker No. 1. Quiros, like Stanley Marshall, called BP America. Just as with Stanley Marshall, Quiros spoke with H.F. Young, who assured Quiros that everything was fine and that Young would send Quiros a copy of the letter Young had sent to Stanley Marshall concerning activities on the Marshall Lease. On July 16, 1981, Quiros received a letter from Young that stated:

> I certainly did enjoy visiting with you on the telephone today. In answer to your inquiry about the history of the Walker Well No. 1 that we drilled on the tract before Sanchez-O'Brien spudded in their well, enclosed is a Xerox copy of a letter that I sent to Mr. Stanley Marshall Jr. on June 29, 1981, giving them this same information.
>
> Very truly yours, H.F. Young

Vaquillas claims, as did the Marshalls, that the letter failed to disclose certain information and contained misleading half-truths, all designed to make the lessors believe BP America had continuously engaged in good faith efforts to obtain production from the well, there had been no cessation in operations for sixty days, and therefore the lease was still in effect. Satisfied by the representations in the letter, Vaquillas believed the lease was still in effect.

Sanchez-O'Brien drilled an additional twenty wells on the Ranch and, pursuant to the farmout agreement, was awarded five assignments of 640 acres, for a total of 3,200 acres of the lease purportedly held by BP America. BP America retained an overriding royalty interest and the deep rights in the acreage below approximately 11,600 feet. Through a series of assignments, Wagner subsequently acquired the 3,200 acre leasehold previously held by Sanchez-O'Brien ("the Wagner Leasehold").[8]

---

[8] At the time Sanchez-O'Brien first drilled, it assigned part of its leasehold interest to related entities and part to Jake L. Harmon. In 1990, the Sanchez-O'Brien entities assigned their interest to Fina Oil and Chemical Company, who then sold its interest in 1994 to Duer Wagner & Co., who also acquired Harmon's interest in 1996. Duer Wagner

In 1997, Vaquillas brought this suit, which was originally based on an alleged breach of the Vaquillas Lease's implied covenants to reasonably develop and market hydrocarbons. However, during discovery, Vaquillas became aware of BP America's alleged fraud with regard to its "operations" on the J.O. Walker No. 1. On June 29, 2000, Vaquillas amended its pleadings to allege fraud, fraudulent concealment, and lease termination. Wagner responded to the suit asserting it acquired title to the Wagner Leasehold either by adverse possession or as a bona fide purchaser.

After settling with various parties including BP America, Vaquillas went to trial solely against Wagner. In addition to the findings regarding lease termination and fraud in favor of Vaquillas, the jury found (1) Vaquillas could not have discovered the lease termination or the fraud until June 2000, (2) Wagner had adversely possessed the Wagner Leasehold under the three, five, and ten-year statutes of limitations, (3) Wagner was a bona fide purchaser, and (4) Vaquillas's failure to file a timely suit against Wagner was not excused. In its judgment, the trial court declared the Vaquillas Lease with BP America had terminated but Wagner had acquired a leasehold interest in the Wagner Leasehold by adverse possession and as a bona fide purchaser. Vaquillas appeals from this portion of the judgment.

First, according to Vaquillas, while Wagner was found to have adversely possessed the Wagner Leasehold for the given periods of time, the jury also found Vaquillas's cause of action to recover the property did not accrue until June 2000. Vaquillas argues the trial court should have entered judgment in its favor because Wagner did not adversely possess the property for the requisite number of years after the cause of action accrued. *See* TEX. CIV. PRAC. & REM. CODE ANN. §16.024-.026 (Vernon 2002). Second, Vaquillas claims there was nothing adverse about Wagner's

assigned its interest to the Wagner family members and employees who are the appellees in this case. Accordingly, Wagner held a 100% interest in the leasehold.

possession under the applicable law regarding adverse possession by cotenants.  Finally, Vaquillas

contends the bona fide purchaser finding is irrelevant and unsupported by the evidence.

### VAQUILLAS ISSUE TWO – NO ADVERSE POSSESSION BY WAGNER

Vaquillas contends there was no evidence that Wagner's possession was adverse when

measured against the proper standard.  Vaquillas argues Wagner and Vaquillas were cotenants and

Wagner therefore had to prove it "ousted" Vaquillas to establish adverse possession.  Though on

appeal this issue is framed as a legal and factual sufficiency point, at trial Vaquillas's argument was

that the trial court should not have submitted the adverse possession issue to the jury because there

was no evidence of ouster.  Accordingly, we will review this issue as preserved below.

Vaquillas acknowledges adverse possession of a leasehold is possible, but in determining the

degree of adversity that must be proven, the critical question is the relationship between the parties.

*See Pool*, 124 S.W.3d at 194.  In *Pool*, the court noted that the relationship between the parties was

the guide to determining whether possession of the leasehold was adverse.  The court emphasized

its decision in that case did not involve cotenants, repeating that statement no less than three times

in a single paragraph:

> We first consider the relationship between the parties, which guides us in
> determining whether the lessees' possession was adverse.  **The parties to the leases
> were not co-tenants**.  As discussed above, the lessors retained only a royalty interest
> and the possibility of reverter.  The lessors had no right to possess, explore for, or
> produce the minerals.  The exclusive right to do so was conveyed to the lessees.
> Accordingly, even when the lease was in effect, **there was no co-tenancy**.  More
> importantly, if the leases terminated as the lessors contend, the lessees retained no
> interest whatsoever in the minerals.  The entire mineral interest reverted to the
> lessors.  **There was no co-tenancy**.

*Id.* (emphasis added) (internal footnote omitted). If Vaquillas and Wagner were cotenants, Wagner had to prove ouster – unequivocal, unmistakable, and hostile acts by Wagner or its predecessors – to disseize Vaquillas through adverse possession. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 756 (Tex. 2003); *Todd v. Bruner*, 365 S.W.2d 155, 159-60 (Tex. 1963); *York v. Flowers*, 872 S.W.2d 13, 15 (Tex. App.–San Antonio 1994, writ denied) (citing *Todd*, 365 S.W.2d at 156).

Vaquillas claims there was a cotenancy "because of the 50-50 split in the minerals that existed at the time the ARCO [BP America] leases were executed in the 1970s." The evidence demonstrated that Tenneco Oil Company owned fifty percent of the minerals under the Slator Ranch, while the other fifty percent was owned by various entities including Vaquillas. Tenneco's fifty percent share passed to Fina Oil & Chemical Company, which Fina passed to Wagner through an oil and gas lease. Vaquillas entered into an oil and gas lease with BP America with regard to Vaquillas's interest in the "non-Tenneco" portion of the minerals, which ultimately passed to Wagner through the Sanchez-O'Brien farmout. However, this interest reverted back to Vaquillas because of the lease termination. But, because Wagner still has "ownership" of the Fina fifty percent, Wagner and Vaquillas are cotenants with regard to the 3,200 acres. Accordingly, Vaquillas argues the rules regarding cotenants and adverse possession are applicable to our review.

Wagner argues that because it took the Fina fifty percent by lease, it does not now and has never "owned a mineral fee interest" and there is no cotenancy. We disagree. It is well-settled that when a lessee takes an oil and gas lease, the lessee "acquires ownership of all the minerals in place." *Pool*, 124 S.W.3d at 192. "The lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Id.* (citing *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 28-29 (1929)). "[T]he lessee/grantee acquires ownership of all the minerals in

place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor." *Pool*, 124 S.W.3d at 192. Wagner therefore owned a fee simple determinable interest in the fifty percent leased by Fina. When the lease with Vaquillas terminated because of BP America's cessation of operations, BP America's interest reverted back to Vaquillas. *See id.* Vaquillas, as owner by reversion of its portion of the Slator Ranch minerals, and Wagner, as owner by lease it acquired through Fina, became cotenants. Because they were cotenants, Vaquillas is correct and the ouster standard relating to cotenants applies. *See Todd*, 365 S.W.2d at 160.

Because Wagner and Vaquillas were cotenants, we next determine whether Wagner presented legally sufficient evidence to establish that it took actions that would have placed Vaquillas on notice that Wagner's continued use was adverse to Vaquillas's title. *See King Ranch, Inc.*, 118 S.W.3d at 756. In a legal sufficiency review, "[w]e review the evidence in the light most favorable to the verdict, disregarding all contrary evidence that a reasonable jury could have disbelieved." *Ysleta Ind. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005).

As a cotenant, Wagner had every right to explore, drill, and produce without consent from any of the other cotenants, including Vaquillas, because cotenants have the right to enter the common estate and a right to possession. *See Byrom v. Pendley*, 717 S.W.2d 602, 605 (Tex. 1986); *Cox v. Davidson*, 397 S.W.2d 200, 201 (Tex. 1965). In order to disseize Vaquillas by adverse possession, Wagner had to produce evidence showing it or its predecessors committed unequivocal, unmistakable, and hostile acts that put Vaquillas on notice of Wagner's intent to oust Vaquillas from the leasehold. *See Todd*, 365 S.W.2d at 159-60; *Poenisch v. Quarnstrom*, 361 S.W.2d 367, 369 (Tex. 1962). This is a stricter standard than that required for a stranger to prove adverse possession and for good reason:

> "The difference" . . . "is, that acts which, if done by a stranger, would per se be a disseizin, are, in the case of tenancies in common, susceptible of explanation consistently with the real title. Acts of ownership in tenancies in common are not necessarily acts of disseizin. It depends on the intent with which they are done, and their notoriety. The law does not presume that one tenant in common intends to oust another. The fact must be notorious, and the intent must be established by proof." *Prescott et al. v. Nevers et al.*, [19 F.Cas. 1286, 1288 (C.C. Me. 1827) (No. 11, 390)].
>
> Any cotenant has a right to be in the possession of property in which he owns an interest, hence if the acts of the respondents and their predecessors in title are susceptible of explanation consistent with the existence of the common title then such acts cannot be such as to give constructive notice to the cotenants out of possession.

*Todd*, 365 S.W.2d at 160. Vaquillas contends neither Wagner nor its predecessors performed any acts after the lease terminated in 1981 to put Vaquillas on notice that Wagner was repudiating the cotenancy.

Wagner asserts there is evidence of actual notice including: continuous drilling and production from wells; direct knowledge through family members of every well drilled; operations on property under documents of title filed in the public deed records; public records showing payment of taxes; receipt of monthly royalty checks; signed division orders; and disputes over deductions from royalties. We agree with Vaquillas that this evidence, whether considered singularly or collectively failed to give Vaquillas notice that Wagner was repudiating the cotenancy.

Because cotenants have the right to enter and possess the common estate, evidence of nineteen or more years of drilling and production is not evidence of unequivocal, unmistakable, and hostile acts that put Vaquillas on notice of repudiation. *See Byrom*, 717 S.W.2d at 605; *Poenisch*, 361 S.W.2d at 369. Nor does conducting operations on the property under documents of title filed in the public deed records constitute notice of repudiation. Actions by a cotenant to possess or use the land are not actions that can be considered unequivocal, unmistakable, and hostile. *See Byrom*,

717 S.W.2d at 605. Once a cotenancy is created, the filing of documents affecting title by such a cotenant are of no moment as the law does not require other cotenants to constantly examine records to guard against the filing of instruments that might affect their title. *See Spiller v. Woodard*, 809 S.W.2d 624, 627 (Tex. App.–Houston [1st Dist.] 1991, no writ); *Rau v. Christy*, 383 S.W.2d 957, 958 (Tex. Civ. App.–Waco 1964, no writ) (holding that attempted transfer by cotenant of entire property and recordation of deed did not put other cotenant on notice of adverse holding). Nor was Wagner's payment of taxes any evidence of repudiation. *See Todd*, 365 S.W.2d at 160; *Poenisch*, 361 S.W.2d at 369.

Wagner next claims that payment of royalties to Vaquillas, disputes over royalties, and Vaquillas's signing of division orders were notice of repudiation. Wagner fails to explain how these acts are hostile or unequivocal given BP America's fraudulent concealment of the lease termination and the resulting cotenancy between Wagner and Vaquillas. Payment of royalties and responding to division orders are not the sort of hostile, unmistakable, and unequivocal acts that can disseize a cotenant through adverse possession by repudiation. *See id.*

Finally, Wagner argues Vaquillas's admission that it knew Wagner had acquired the lease on the 3,200 acres is evidence of repudiation by Wagner. Again, this knowledge is insufficient to establish repudiation given the fraud and the resulting cotenancy. Even if Vaquillas knew Wagner acquired the lease, it did not know its lease agreement with BP America had terminated and therefore Vaquillas knew only that its lease with BP America had been transferred to a successor. This does not amount to knowledge of repudiation.

The evidence Wagner claims constituted actual notice of repudiation is legally insufficient. The evidence produced by Wagner is no evidence of unequivocal, unmistakable, and hostile acts to

disseize Vaquillas through adverse possession. *See King Ranch, Inc.*, 118 S.W.3d at 756; *Todd*, 365 S.W.2d at 159-60; *York*, 872 S.W.2d at 15.[9]

Wagner next asserts that repudiation can be constructively established due to the passage of time. *See, e.g., Glover*, 187 S.W.3d at 215 (holding there was constructive notice of repudiation where lessee and its successors held leasehold and extracted oil therefrom for almost seventy years); *Thedford v. Union Oil Co.*, 3 S.W.3d 609, 614 (Tex. App.–Dallas 1999, pet. denied) (same). However, a finding of constructive repudiation is not warranted in this case because far less time had passed than in those cases recognizing constructive repudiation. Furthermore, this case involves a complicated chain of title and includes underlying fraudulent conduct that precluded the lessor from knowing the lease had terminated. To find adverse possession under these circumstances would lower the standard of proof for cotenants when the supreme court has previously declared that it will not tolerate the relaxation of the rules governing adverse possession. *See Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (per curiam) (holding that adverse possession doctrine is harsh and before such a step is taken law requires parties' intentions to be very clear). Under the circumstances of this case, Wagner's possession of nineteen years does not constitute constructive notice of repudiation.

Based on the foregoing, we sustain Vaquillas's second issue and hold the evidence was legally insufficient to support the trial court's submission of the issues on adverse possession.

---

[9] Wagner's reliance on *Pool* to support its claim of repudiation is misplaced. *Pool* did not involve a cotenancy. 124 S.W.3d at 194. Accordingly, the evidence relied upon by the court in *Pool* does not support adverse possession in this cotenancy case. The relationship between cotenants is different from the relationship of the parties in *Pool* and, therefore actions by the adverse claimant that established adverse possession in *Pool* might not be sufficient to establish adverse possession in a cotenancy case.

## VAQUILLAS ISSUE THREE – BONA FIDE PURCHASER

In its third issue Vaquillas contends the jury's finding that Wagner was a bona fide purchaser is irrelevant and thus will not save the adverse possession judgment in favor of Wagner. In question nineteen, the jury was asked if Wagner was a bona fide purchaser of the Wagner Leasehold. The accompanying instruction defined a bona fide purchaser as one who acquires legal or apparent legal title to real property in good faith for valuable consideration without notice of either a title infirmity or a third party claim that the title is invalid.

Vaquillas argues bona fide purchaser status is legally immaterial to an adverse possession theory because it cannot transfer title that never existed. In other words, bona fide purchaser status cannot confer rights that do not exist. We agree based on the supreme court's holding in *Rio Bravo Oil Co. v. McEntire*, 128 Tex. 124, 126-28, 95 S.W.2d 381, 382-83 (1936).

In *Rio Bravo*, a railway company sold three tracts of land to Kelley in two separate transactions. In each transaction the railway company reserved the mineral rights to itself. *Id*. at 382-83. Years later, Rio Bravo sued Kelley's successor in interest, McEntire, claiming it owned the mineral rights, "from and under the railway company." *Id*. at 382. McEntire had previously leased the oil and gas rights in the property to Gulf Production Company, so it intervened claiming it was an innocent purchaser and thus entitled to the oil and gas pursuant to its lease with McEntire. *Id*. at 388. With regard to the claim of Gulf Production Company, the supreme court held:

> The Gulf Production Company's claim that it is an innocent purchaser of the oil and gas by virtue of its oil and gas lease from . . . McEntire cannot be sustained, because it took under the lease only such title as McEntire had to the oil and gas. McEntire had no title, either legal or equitable, to the oil and gas, because title to the minerals was reserved by the railway company when it sold the land to Kelley, under whom McEntire acquired his title . . . .

*Id.* Accordingly, Wagner could not acquire title to the oil and gas because the lease had already terminated at the time BP America signed the farmout agreement with Sanchez-O'Brien. Neither BP America nor is successors had any interest to convey. *See id.*

Wagner counters that the bona fide purchaser doctrine protects innocent purchasers of property and it extends to purchasers of oil and gas and transfers with a fraudulent history. *See Aluminum Co. of Am. v. Mineral Holding Trust*, 157 Tex. 54, 299 S.W.2d 279 (1956), *cert. denied*, 355 U.S. 814 (1957); *Pegues v. Moss*, 140 S.W.2d 461, 463 (Tex. Civ. App.–El Paso 1940, writ dism'd by agr.). We agree that the bona fide purchaser doctrine applies to cases involving fraudulent conveyances, even oil and gas leases. However, this case, unlike the cases cited by Wagner, does not involve fraudulent **conveyances**. There was no allegation of a fraudulent conveyance nor did the jury find one. Here, the fraud occurred with regard to facts relating to the lease termination. Wagner has no legal title because BP America had no title to convey to Sanchez-O'Brien. *See Rio Bravo Oil*, 95 S.W.2d at 388; *Hennessy v. Blair*, 107 Tex. 39, 41-42, 173 S.W. 871, 872 (1915) (holding that "the equity of an innocent purchaser is incapable of assertion without the ownership of the legal title.").

Wagner also contends *Rio Bravo Oil* is inapplicable because the chain of title evident in the deed records in that case defeated the lessee's claims that it had purchased title. Here, in contrast, the deed records showed BP America had title to the Wagner Leasehold. Therefore, nothing in the deed records put Wagner on notice that BP America did not hold title. Accordingly, Wagner claims that unlike the purchaser in *Rio Bravo Oil*, it was entitled to bona fide purchaser status. We disagree with Wagner's emphasis on the notice provided by the chain of title. Notice was not the issue in *Rio Bravo Oil*. *Rio Bravo Oil* decided whether a lessee could be a bona fide purchaser if the party from

which it took had no interest. 95 S.W.2d at 388. The court firmly answered "no" to this question. *Id.* Contrary to Wagner's interpretation, the court's reference to the chain of title in the deed records emphasized that the lessee's predecessor, McEntire, "had no title, either legal or equitable, to the oil and gas, because title to the minerals was reserved by the railway company when it sold the land to Kelley, under whom McEntire acquired his title." *Id.* at 388. The court did not hold that Gulf Production Company was not a bona fide purchaser because the deed records put it on notice that McEntire had no interest; the court held Gulf Production Company was not a bona fide purchaser because it could take by virtue of the lease only that which McEntire owned, which was nothing. *See id.* The focus was on what the predecessor owned, not notice of what he owned. *See id.* Here, when the lease terminated, BP America lost all rights to the leasehold and there was nothing for it or its successors to convey to Wagner. These events precluded Wagner's bona fide purchaser defense. Accordingly, we hold the jury's bona fide purchaser finding cannot support the judgment in favor of Wagner. We sustain Vaquillas's third issue.

### VAQUILLAS SUB-ISSUE – ATTORNEY'S FEES

In its prayer for relief in its opening brief, Vaquillas asked this court to remand its attorney's fees claim for reconsideration in the event we determine the judgment was erroneous and Vaquillas is entitled to title and possession of the Wagner Leasehold. Vaquillas contends it is entitled to such fees in the event it prevails because a court may award fees to the successful party in an adverse possession action. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.034 (Vernon 2002). In response, Wagner contends that even if we reverse the judgment, we should not remand for attorney's fees because (1) Vaquillas has brought no issue or point of error complaining of the trial court's failure

to award attorney's fees, and (2) although Vaquillas sought attorney's fees below, its request was properly denied because fees are not recoverable in a title dispute.

With regard to waiver, we hold no specific point of error or issue was required. Attorney's fees were contingent on Vaquillas's prevailing on appeal. Having briefed the main issues, nothing more was required than to ask for remand for attorney's fees in the event our resolution favored Vaquillas.

A recovery of attorney's fees is barred in a trespass to try title action because it is not provided for in the Texas Property Code. *See EOG Resources*, 239 S.W.3d at 304. A trespass to try title suit is "the method of determining title to lands, tenements, and other real property." TEX. PROP. CODE ANN. § 22.001(a) (Vernon 2000). Though Vaquillas's suit was one to determine title to the Wagner Leasehold, Wagner asserted adverse possession in response. Section 16.034 of the Texas Civil Practice and Remedies Code provides that a prevailing party is entitled to attorney's fees "[i]n a suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, if the prevailing party recovers possession of the property from a person unlawfully in actual possession." TEX. CIV. PRAC. REM. CODE ANN. § 16.034(a) (Vernon 2002). Under section 16.034, the prevailing party in this case was clearly entitled to attorney's fees. Given that Wagner wholly fails to contest recovery under section 16.034, we hold Vaquillas is entitled to a reversal and remand to the trial court for a determination of attorney's fees.

## CONCLUSION TO VAQUILLAS/WAGNER APPEAL

We sustain Vaquillas's issues two and three. Because of our disposition of these issues, we need not address Vaquillas's first issue. We reverse and remand the portion of the appeal between Vaquillas and Wagner to the trial court for a determination of attorney's fees and for entry of judgment in accordance with this opinion.


Steven C. Hilbig, Justice